## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENTELOS, INC.,[1] | Case No. 11-12329 (___) |
| Debtor. | |

## DECLARATION OF SHAWN O'CONNOR IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Shawn O'Connor, declare, under penalty of perjury, as follows:

1.      On June 1, 2011, I was appointed to the Board of Directors of Entelos, Inc. ("Entelos" or the "Debtor").

2.      On July 11, 2011, Entelos' Board of Directors appointed me as the Chief Executive Officer of Entelos.

3.      I have personal knowledge relating to Entelos' business, financial affairs, and books and records.

4.      As the Chief Executive Officer, I am responsible for devising and implementing the Debtor's business plans and strategies and overseeing the Debtor's financial, operational, and other business affairs.  I am also responsible for supervising the maintenance of the Debtor's books and records.  Moreover, in my capacity as the Chief Executive Officer of the Debtor, I am familiar with the Debtor's restructuring process (the "Restructuring") and have been engaged in, among other things, (a) developing, negotiating, and implementing the Debtor's restructuring plan to preserve and maximize the value of the Debtor's assets and (b) supervising the preparation of the documents necessary to implement the Restructuring.

---

[1] The Debtor in the above captioned case is Entelos, Inc.  The last four digits of the Debtor's tax identification number are 5818.

# I.    FACTUAL BACKGROUND

5.    On July 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in an effort to preserve and maximize the value of its estate, thereby commencing the above-captioned bankruptcy case (the "Case").

## A.    Overview Of The Debtor's Business.

6.    Entelos is a privately-held Delaware corporation.

7.    Entelos is a cutting edge software and services company that provides customized solutions to complex problems in healthcare by the creation and use of innovative tools and products.  Generally, Entelos consults for and collaborates with pharmaceutical and consumer product companies, as well as governmental and research organizations, worldwide.  Entelos is a leader in the development and application of mechanistic disease models and biosimulation methodologies designed to optimize clinical trial design, identify biomarker patterns, characterize sub-populations, and improve efficiency in patient management and healthcare systems.  Entelos' mechanistic disease models allow for a deeper exploration of novel target biology and hypotheses testing in the absence of supporting human clinical data.

8.    Combining biology, engineering, and informatics,[2] Entelos is a cutting-edge software and services company that simulates experiments in large-scale computer models (*in silico*),[3] rapidly testing what would otherwise take months or years to do in the laboratory or clinic.  As the leader in *in silico* biosimulation modeling, Entelos is a life sciences company

---

[2] "Informatics" is the application of information science and statistical techniques to the management of information.

[3] "*In silico*" means performed on computer or via computer simulation, as opposed to "*in vivo*," meaning performed on living organisms.

applying next-generation predictive technologies across multiple markets in research and development of healthcare and consumer products to dramatically lower the risk, time, and cost of product development. Entelos' customers save both time and money by optimizing clinical programs and research and development through virtual population simulations, focusing on the best inclusion criteria, dosing, timing, and markers to obtain meaningful trial outcomes. Through this process, Entelos provides advanced knowledge of a compound's likely safety profile and effectiveness, creating an opportunity to shift termination or advancement decisions to occur earlier in the drug and product development process, and thereby improve overall drug and product development efficiency.

9.     Seeking to build the most accurate models of human disease possible, Entelos currently provides customized products, technology and research services. Entelos has expertise in the following areas: Toxicity and Safety, Respiratory, Immunology/Inflammation, Metabolism, Cardiovascular, Epidermis and Erythropoiesis.[4]

10.     Entelos' *in silico* disease technology, known as PhysioLab®, is used to select and develop compounds, assess safety, optimize clinical trials and combination therapies, and reprofile drugs. The PhysioLab® platforms, "virtual human" technology, and toxicology reference systems are highly predictive and assist clients to develop safer and more effective drugs and personal care products. PhysioLab® research teams work closely with a broad network of experts to build, refine, and validate each disease- and therapeutic area-specific PhysioLab® platform. PhysioLab® platforms are large scale, computer-based mathematical models of physiology. With PhysioLab® virtual patients and virtual populations, Entelos is able

---

[4] "Erythropoiesis" is the formation or production of red blood cells.

to simulate the *in vivo* effects of drugs and optimize the effects and protocols before running time-consuming and expensive clinical studies.

11.     Entelos' PhysioLab® platforms simulate complex biological systems *in silico*, enabling a novel way to perform biology-based research and development. The success of PhysioLab® platforms as a systems biology framework lies in Entelos' cutting-edge proprietary modeling software that allows researchers to translate biology into mathematics; scalable, hypothesis-driven approaches to modeling biology and pathophysiology;[5] virtual patients and populations to explore the range of human physiology; and model-based research and development techniques.

12.     PhysioLab® technology is protected by patents (issued and pending) related to its underlying software, specific disease models, and the scientific methodologies developed for its application.

**B.     Pre-Petition Capital Structure**

13.     Entelos was incorporated in the State of California on July 31, 1996.

14.     On April 4, 2006, Entelos reincorporated from the State of California into the State of Delaware.

15.     From April 2006 until June 2009, Entelos' common stock was traded on the Alternative Investment Market of the London Stock Exchange (the "AIM Exchange"). Entelos, with the support of its stockholders, delisted its common stock from the AIM Exchange effective as of July 1, 2009.[6]

---

[5] "Pathophysiology" is the scientific study of changes associated with or resulting from disease or injury.

[6] Entelos is the parent company of the following non-debtor subsidiaries: Entelos (UK) Ltd., Eratosthenes, Inc. and Digitalself, Inc. The non-debtor subsidiaries do not have any current business operations. The non-debtor subsidiaries have little or no assets.

16. Entelos' capital stock is held by venture firms, other life sciences companies, and individual investors. Imperium Master Fund, Ltd. ("Imperium") holds 3,990,537 shares of the Class A Common Stock in Entelos, which is approximately 6.07% percent of the shares of Class A Common Stock. Imperium also holds all of the 300,459,823 shares of Series A Preferred Stock.

17. As of the Petition Date, the Debtor owed first priority, secured debt to Imperium in the approximate amount of $8,442,000, inclusive of interest accrued though July 22, 2011, plus interest thereafter and all costs, fees, expenses (including reasonable attorneys' fees and legal expenses) and other charges (the "Prepetition Obligations"), which consists of the following notes: (1) Senior Term Note dated April 15, 2010, in the original principal amount of $6,000,000,[7] (2) Supplemental Term Note, dated June 2, 2011, in the original principal amount of $500,000, (3) Second Supplemental Term Note, dated June 24, 2011, in the original principal amount of $850,000, and (4) Secured Term Promissory Note, dated July 22, 2011, in the original principal amount of $300,000 (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "Existing Financing Agreements").

---

[7] Imperium and Entelos are parties to that certain Securities Purchase and Loan Agreement, dated as of December 21, 2007, pursuant to which Imperium purchased from Entelos a senior secured note with a purchase price of $1,500,000.00 and a stated principal amount at maturity of $1,698,758.28 (the "Prior Note"), and two original issue secured convertible debentures with a purchase price of $3,000,000.00 and $2,000,000.00, respectively, and a stated principal amount at maturity of $3,314,139.00 and $2,209,426.00, respectively (the "Convertible Debentures"). Entelos defaulted in the payment under the Prior Note. Thereafter, Imperium and Entelos entered into an Exchange Agreement dated as of March 25, 2010, to restructure the Prior Note and the Convertible Debentures by converting the outstanding principal balances on the Prior Note and Convertible Debentures, and all accrued and unpaid interest and any applicable redemption premium and/or penalties thereon, into the Senior Term Note and shares of Series A Preferred Stock.

18.     Pursuant to a Security Agreement dated as of December 21, 2007, as amended on January 1, 2008, and the Amended and Restated Security Agreement dated as of April 15, 2010, the Existing Financing Agreements are secured by substantially all of Entelos' assets.

19.     As of the Petition Date, the Debtor also owed unpaid pre-petition unsecured claims in excess of $10 million.

**C.      Events Leading to the Debtor's Bankruptcy Filing**

20.     In 2008,[8] Entelos had revenue of $18.12 million and operating costs of $30.64 million, resulting in a loss from operations of $12.52 million.

21.     As of December 31, 2008, Entelos had approximately $2 million in cash.

22.     As of December 31, 2008, Entelos had total assets with a book value of $8.3 million and total liabilities of $13.2 million.

23.     As of December 31, 2008, Entelos had accumulated a shareholders' deficit of $87.15 million.

24.     Based on its financial performance through 2008, Entelos' auditors stated that "[g]iven the Company's recurring net losses, negative cash flows from operations, stockholders' deficit, negative working capital, and the uncertainty related to its debt covenants, there is substantial doubt about the ability of the Company to continue as a going concern."

25.     Market conditions in the pharmaceutical industry have deteriorated in recent years.  For example, it has been reported that overall research and development ("R&D") investment by the top 10 pharmaceutical companies fell $421 million from 2008 to 2009 (from $57.54 billion to $57.12 billion).  See http://www.pharmaceutical-market-research.com/publications/pharmaceutical_companies/pharmaceutical_companies_performance_

---

[8] Calendar year 2008 is the last year for which the Debtor has audited financial statements.

tables.html. Reuters noted that pharmaceutical R&D spending decreased by $2.0 billion dollars from 2009 to 2010. See http://www.reuters.com/article/2011/06/26/pharmaceuticals-rd-idUSL6E7HO1BL20110626 (June 26, 2011).

26. Entelos continued to operate with limited liquidity in a difficult pharmaceutical industry.

27. For the first six months of 2011, the Debtors' received, on a cash basis, $2.6 million in revenue (based on the Debtor's unaudited financial statements for such period) and $5.7 million in operating expenses.

28. The Debtor also believes that its prior executive officers made strategic mistakes and mismanaged the Debtor and its resources, thereby thrusting the Debtor into a severe liquidity crisis, which has not lessened.

29. With little revenue in a stingy capital market, the Debtor has been unable to generate adequate liquidity from revenue or financing to pay its prepetition obligations.

30. On or about June 17, 2011, the landlord of the Debtor's headquarters property located at 110 Marsh Drive, First Floor, Foster City, California (the "Premises") instituted an unlawful detainer and eviction action against the Debtor in the Superior Court of California, San Mateo County (the "Superior Court"), which case was assigned Case No. Civ 204137 (the "Landlord Action"). On July 21, 2011, the parties to the Landlord Action attended mediation relative to the Landlord Action but were unable to resolve their disputes. An unlawful detainer hearing in the Landlord Action is scheduled for hearing before the Superior Court on July 25, 2011 at 9:00 a.m. (Pacific).

31. On July 22, 2011, the Debtors also received a default notice from Imperium (the "Default Notice"). Imperium advised the Debtor that various Events of Default have occurred

and are continuing to occur under the Promissory Notes, including, without limitation, a material adverse change to (a) the financial condition or results of Entelos' operations or (b) Entelos' cash balances or cash flows (collectively, the "Specified Defaults"). As a result of the occurrence of the Specified Defaults, Imperium declared that it was (i) exercising its right pursuant to Section 3(a) of the Promissory Notes to cause the Promissory Notes to be redeemed at the redemption price set forth in such Section 3(a) and (ii) notifying the Debtor that all Promissory Notes shall accrue certain default interest.

### D.    Prior Efforts to Raise Capital or Sell the Business.

32. Based on Entelos' books and records, I understand that, in 2009, Entelos engaged Seven Hills Partners, LLC ("Seven Hills"), a boutique investment bank focused on financings and mergers & acquisitions for growth companies, to raise capital (debt or equity) for, or find an acquirer for, Entelos. Seven Hills' efforts did not result in any transaction.

## II.    FIRST DAY MOTIONS AND APPLICATIONS

33. I have formed opinions as to: (i) the necessity of obtaining the relief sought by the Debtor in its first-day applications and motions described herein (collectively, the "First Day Pleadings"),[9] (ii) the need for the Debtor to continue to operate its business to maximize value, (iii) the adverse impact on this Case if the Debtor does not obtain the requested relief, and (iv) the immediate and irreparable harm to which the Debtor will be exposed if the Court does not approve the relief requested in the First Day Pleadings. My opinions are based on my knowledge of the Debtor's business, my review of various materials and information, discussions with Imperium, and discussions with other key personnel of the Debtor.

---

[9] This Declaration addresses only the First Day Pleadings for which the Debtor seeks relief at the "first day" hearing. Although the Debtor will likely file other motions and applications on or shortly after the Petition Date, those other motions and applications will be noticed for a future hearing.

34.     This Declaration is submitted in support of the Debtor's voluntary petition and the First Day Pleadings.

35.     I reviewed each of the First Day Pleadings and participated in their preparation. I believe, to the best of my knowledge and reliance on other executives of the company, that the facts set forth in the First Day Pleadings are true and correct. This representation is based on my review of various materials and information as well as my experience and knowledge of the Debtor's operations and financial condition. Based on the foregoing, if called to testify, I could and would, testify competently to the key facts set forth in each of the First Day Pleadings.

36.     The relief sought in the First Day Pleadings will minimize the adverse impact of this Case on the Debtor and will maximize value for the Debtor's creditors. I believe that the relief sought in the First Day Pleadings is necessary to enable the Debtor to operate effectively as a chapter 11 debtor-in-possession.

37.     As described more fully below, the Debtor carefully tailored the relief requested in the First Day Pleadings in consultation with its professionals to ensure that the Debtor's immediate operational needs are met and that the Debtor will not suffer any immediate and irreparable harm. I personally participated in the analysis that led to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein. The relief requested is narrowly tailored to address those issues that require urgent relief to sustain the Debtor's immediate operability.

**A.** **Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed.R.Bankr.P. 2002, 4001 and 9014 (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims. (IV) Granting Adequate Protection and (V) Scheduling a Final Hearing**

38.     In order to continue the orderly operation of the Debtor's business, maintain the Debtor's business relationships with vendors, suppliers and customers, make payroll, capital expenditures and satisfy other working capital and operational needs, and provide the liquidity necessary to ensure the proper administration of this Case, the Debtor has concurrently herewith filed a motion (the "DIP Motion")[10] for entry of interim and final orders, pursuant to Sections 105, 361, 362, 363(c), 363(e), 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, that, if granted, will among other things:

(a)     authorize the Debtor to obtain post-petition financing pursuant to sections 363 and 364 of the Bankruptcy Code by entering into a secured, post-petition, debtor-in-possession credit facility on a super-priority basis (as may be amended, supplemented or otherwise modified from time to time, the "DIP Facility") providing for a loan facility in an aggregate principal amount of $1.7 million (the "DIP Loans") for operating costs in accordance with an agreed budget (the "Budget");

(b)     authorize the Debtor to execute and enter into the DIP Facility among the Debtor and Imperium, in its capacity as DIP lender (the "DIP Lender"), Imperium Advisers, LLC, in its capacity as collateral agent for Imperium (in such capacity, the "Collateral Agent") and non-debtor affiliate guarantors Entelos (UK) Ltd., Eratosethes, Inc. and Digitalself,

---

[10]  Capitalized terms used but not defined in this subsection I of this Declaration have the meanings given to them in the DIP Motion.

Inc. and all documents, agreements or instruments in connection with the DIP Loans or related thereto (collectively, the "DIP Loan Documents") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(c)     authorize the Debtor to use cash collateral (as such term is defined in the Bankruptcy Code) in which Imperium, as pre-petition lender, has an interest, to pay the pre-petition secured claims of Imperium as and when it is collected;

(d)     grant liens and super-priority claims to and on behalf of and for the benefit of the DIP Lender in all of the Debtor's pre-petition and post-petition collateral in accordance with the DIP Loan Documents to secure repayment of the DIP Facility;

(e)     grant adequate protection liens for the benefit of the DIP Lender, to the extent that there is any diminution in value of the Imperium's interests in pre-petition collateral;

(f)     pending a final hearing on the DIP Motion (the "Final Hearing"), approve the DIP Loans under the DIP Facility in the amounts provided for in the Budget;

(g)     modify the automatic stay, under section 362 of the Bankruptcy Code, to, among other things, permit the DIP Lender to exercise, upon the occurrence of and during the continuance of an event of default and after five (5) business days notice of, all rights and remedies under the DIP Loan Documents;

(h)     subject to and only effective upon the entry of the final order approving the DIP Motion, granting such relief, limit the Debtor's right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code; and

(i)     schedule the Final Hearing on the DIP Motion and approve notice with respect thereto.

39. The Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course without the DIP Facility. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the assets of the Estate for the benefit of all creditors of the Debtor. The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the Collateral Agent and Imperium is vital to the preservation and maintenance of the going concern value of the Debtor. Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of its business operations, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate. Accordingly, the timely approval of the relief requested in the DIP Motion is imperative.

**B. Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a), 363, And 365, And Bankruptcy Rules 2002, 6004, And 6006 For (I) An Order (A) Establishing Bidding And Auction Procedures Related To The Sale Of Substantially All Of The Debtor's Assets; (B) Scheduling An Auction And Sale Hearing; (C) Establishing Certain Notice Procedures For Determining Cure Amounts For Executory Contracts And Unexpired Leases To Be Assigned; And (D) Granting Certain Related Relief**

40. The Debtor and Imperium (together with its designee or assignee, the "Purchaser") have entered into that certain Bill of Sale regarding Imperium's proposed purchased of substantially all of the assets of the Debtor pursuant to a credit bid (the "Stalking Horse Agreement"). The Stalking Horse Agreement provides the Debtor with a firm commitment that is not subject to any financing or due diligence contingencies and thereby

provides the Debtor with a floor against which other bidders can submit competing bids through an auction process.

41.     The Stalking Horse Agreement also provides that Imperium, as stalking horse bidder (the "Stalking Horse Bidder"), has agreed to pay the cure obligations in connection with the assumption and assignment of executory contracts and unexpired leases to the extent such leases and contracts are sold to Purchaser.

42.     The Stalking Horse Bidder is not seeking the payment of any break-up fee or expense reimbursement.

43.     In order to comply with its obligations under the DIP Loan Documents, the Debtor requests that the Court schedule (i) the Bidding Procedures Hearing during the "first" day" hearings, and (ii) the Sale Hearing approximately forty-five (45) days after the Petition Date.  Consistent with this requirement, the Debtor proposes the following timeline for conducting the sale process:

| **Action** | **Deadline/Hearing** |
| --- | --- |
| Bidding Procedures Hearing | First Day Hearing  (**July 26, 2011**) |
| Proposed Bid Deadline | 5 business days before auction (Friday, **August 26, 2011**) |
| Auction | 39 days after petition date  (Friday, **September 2, 2011**) |
| Sale Hearing | 45 days after petition date (Thursday, **September 8, 2011**) |
| Consummation of Sale | 46 days after petition date (Friday, **September 9, 2011**) |

44.     Given their financial condition, liquidity and prior marketing efforts, the Debtor believes that the proposed timeline, including holding the bidding procedures hearing at the first day hearing, is sufficient to complete a fair and open sale process (especially in light of the absence of any breakup fee or expense reimbursement) that will maximize the value received for the Debtor's assets.  The proposed timeline will provide the Debtor with sufficient time to reach out to prospective purchasers in advance of the Proposed Bid Deadline to maximize the value of

their assets.  The Debtor believes that pursuing the proposed sale on the timetable set forth in the

proposed bidding procedures will enable the Debtor to maximize the value of the Assets.  In the

absence of such a sale on the proposed timetable, the Debtor will face further deterioration in the

value of the Assets because it will have insufficient liquidity to continue operations.

 **C.**  **Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed.R.Bankr.P.
    2015 and Del.Bankr.L.R. 2015-2 for an Order (I) Authorizing Use of Pre-
    Petition Accounts and Business Forms and (II) Waiving the Requirements of
    11 U.S.C. § 345(b) on an Interim Basis**

 45.  The Debtor seeks entry of an order (a) authorizing the Debtor's continued use of

its existing bank accounts and business forms, (b) waiving the requirements of section 345(b) of

the Bankruptcy Code on an interim basis with respect to the Debtor's deposit practices, and

(c) allowing the banks to continue to set off against the Debtor's bank accounts ordinary

administrative fees associated with the operation of the Debtor's business.

 46.  The Debtor seeks a waiver of the Office of the United States Trustee's

requirement that their bank accounts be closed and that new post-petition bank accounts be

opened.  If enforced in this Case, such requirements would cause disruption to the Debtor's

business and would impair the Debtor's chapter 11 efforts.  The Debtor's need their existing

bank accounts to maintain to ensure smooth collections and disbursements in the ordinary course

of its business.  Therefore, to avoid delays in paying debts incurred post-petition, and to ensure

as smooth a transition to chapter 11 as possible, the Debtor should be permitted to continue to

maintain the existing bank accounts and, if necessary, to open new accounts and close existing

accounts in the normal course of business operations.  Otherwise, transferring the bank accounts

will be disruptive, time consuming, and expensive.

 47.  The Debtor represents that if the relief requested is granted, it will implement

appropriate mechanisms to ensure that no payments will be made on any debts incurred by it

before the Petition Date other than those authorized by this Court. To prevent the possible inadvertent payment of pre-petition claims, except for those otherwise authorized by this Court, the Debtor will work closely with the banks to ensure appropriate procedures are in place to prevent checks and other items issued pre-petition from being honored absent this Court's approval.

48.     The Debtor also requests that it be authorized to continue to use all correspondence and business forms existing immediately before the Petition Date without reference to the Debtor's status as a debtor-in-possession.[11] If the Debtor was required to change its preprinted correspondence and business forms, it would be forced to choose standard forms rather than the current forms with which the Debtor's employees, customers, and vendors are familiar. Such a change in operations would create a sense of disruption and potential confusion within the Debtor's organization and for the Debtor's employees, customers, and vendors. I believe that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationary and business forms. The Debtor respectfully submits that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

49.     The Debtor requests that this Court waive the requirements of section 345(b) of the Bankruptcy Code on an interim basis and permit it to maintain its deposits in its accounts in accordance with its existing deposit practices until such time as the Debtor obtains this Court's approval to deviate from the guidelines imposed under section 345(b) on a final basis. I believe

---

[11] To the extent that the Debtor does not utilize preprinted check stock, letterhead, and business forms, the relief described in this section does not apply to such checks, letterhead, and business forms; any such non-preprinted checks, letterhead, and business forms will contain a reference to the Debtor's status as a debtor-in-possession.

that cause exists to grant an interim waiver of the requirements of section 345(b) for a period of sixty (60) days and that such waiver would be in the best interests of the Debtor and its estate.

**D.** ' **Debtor's Motion Pursuant to 11 U.S.C. Sections 105(a), 363 And 507(a) for an Order (I) Authorizing the Debtor, in Its Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing the Debtor's Banks and Other Financial Institutions to Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests.**

50.     The Debtor has filed a Motion for an Order (I) Authorizing the Debtor, in its Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation, and Employee Benefits and Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (II) Authorizing the Debtor's Banks and Other Financial Institutions to Process, Honor, and Pay Certain Checks Presented for Payment and Fund Transfer Requests (the "Employee Wages and Benefits Motion"). The continued loyalty of Debtor's employees is a necessary component to the Debtor's successful reorganization. If the relief requested in the Employee Wages and Benefits Motion is not granted, the morale of the Debtor's employees will suffer significantly, and the Debtor will risk losing a substantial portion of its current workforce. This type of employee disruption would cause the Debtor significant financial hardship and would negatively affect the Debtor's chances for a successful reorganization.

51.     By this motion, the Debtor requests, in accordance with 11 U.S.C. §§ 105(a), 363, and 507(a), entry of an order: (i) authorizing the Debtor, in its discretion, to (a) pay, to the extent of the $11,725 priority limit in Section 507(a)(4) of the Bankruptcy Code, certain pre-petition employee wages, salaries and other accrued compensation; (b) reimburse all pre-petition employee business expenses; (c) make all contributions to pre-petition benefit programs to the extent the Debtor's contributions to such amount does not exceed $386,925 minus the aggregate

amount of pre-petition wages and salaries paid to salaried Employees after the Petition Date, and to continue such programs in the ordinary course of business.

52.     By the Employee Wage and Benefits Motion, the Debtor also seeks to (a) honor workers' compensation obligations; (b) make certain payments for which pre-petition payroll withholding deductions were made; (c) pay all processing costs and administrative expenses relating to the foregoing payments and contributions; and (d) make all payments to third parties incident to the foregoing payments and contributions; (e) authorizing the Debtor, in its discretion, to continue payment of wages, compensation and employee benefit programs in the ordinary course of business and to pay other costs and expenses related to the foregoing; and (f) authorizing and directing the Debtor's banks and other financial institutions to process, honor and pay certain checks presented for payment and to honor certain fund transfer requests of the Debtor.

53.     The Debtor's failure to pay the pre-petition employee claims would severely undermine the employees' morale and result in significant hardship to the employees.

54.     Employee support is critical to the Debtor's efforts to consummate a sale.  The Debtor cannot risk the substantial disruption to its business operations that would inevitably follow any decline in the workforce morale if the Debtor failed to pay the Pre-petition employee Claims or honor the employee benefits in the ordinary course of its business.

55.     Authority to continue to pay the employees and to maintain current employee benefit programs is necessary to ensure that the Debtor can retain personnel that are knowledgeable about the Debtor's business, to provide incentives for employees to continue to provide quality services to the Debtor at this critical time, and to allow the Debtor to remain competitive in the job markets in which it maintains operations.

56.     It is very difficult for financially troubled companies such as the Debtor to retain employees and to attract and hire replacement employees. The Debtor's staff is highly specialized and, accordingly, difficult to replace on a timely basis. Therefore, preserving employee morale and retaining employees is critical to the Debtor's ability to maximize value and maintain operations.

57.     The Debtor is obligated to pay federal, state and local withholding taxes. Such withholding taxes and social security contributions are withheld from payroll and paid to the appropriate authorities by the Debtor. Therefore, an order confirming the Debtor's authority to pay local, state and federal withholding and payroll-related taxes relating to the pre-petition periods, including, but not limited to, all withholding taxes, Social Security taxes and Medicare taxes, is warranted. The payment of the portion of the payroll obligations that constitutes "trust fund" taxes will not prejudice other creditors of the Debtor's estate since the relevant taxing authorities hold priority claims under Section 507(a)(8) of the Bankruptcy Code with respect to those obligations. In addition, the monies payable for trust fund taxes are not property of the Debtor's estate.

58.     The Debtor has maintained approximately $360,000 in "trust fund" taxes in an account with Silicon Valley Bank (the "Trust Fund Tax Deposit"). The Trust Fund Tax Deposit has remained in said account for the sole purpose of paying certain withholding taxes due with respect to Employees' wages paid or owing between May 2011 and June 2011. The Debtor requests authorization to remit the moneys comprising the Trust Fund Tax Deposit to the appropriate taxing authorities.

59.     In addition, the Debtor seeks authorization to pay all post-petition federal, state and local withholding taxes, tax deposits and processing fees in the ordinary course of business on a going-forward basis.

60.     Without this relief, some, if not all, of the taxing authorities may initiate an audit of the Debtor if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtor's attention away from the reorganization process and result in unnecessary expenses.  Moreover, I understand that if the Debtor does not pay such amounts in a timely manner, the taxing authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, seek payment from the Debtor's directors and officers, and pursue other remedies that will irreparably and immediately harm the estate.

61.     By way of the Employee Wage and Benefit Motion, the Debtor also requests an order authorizing and directing the Debtor's banks and other financial institutions (collectively, the "Banks") to process, honor, and pay all pre-petition and post-petition checks issued or to be issued, and fund transfers requested or to be requested by the Debtor related to the pre-petition employee claims and employee benefits that were not honored or paid as of the Petition Date.  In addition, the Debtor also requests authority to issue post-petition checks or effect fund transfers to replace any pre-petition checks or fund transfer requests that are dishonored or rejected on account of the pre-petition employee claims and employee benefits.

62.     Because of the Debtor's bankruptcy filing, the Banks may dishonor or reject pre-petition checks and fund transfer requests related to pre-petition employee claims and employee benefits.  These checks or fund transfers are or will be drawn on the Debtor's payroll account and can be identified as relating directly to the payment of the pre-petition employee claims and

employee benefits. Therefore, pre-petition checks and fund transfers other than those for pre-petition employee claims and employee benefits will not be inadvertently honored.

63. Accordingly, the Debtor requests that all Banks be authorized and directed to process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related to the pre-petition employee claims and benefits, regardless of whether they are presented or submitted prior to or after the Petition Date. The Debtor has sufficient cash or funding to promptly pay all of the pre-petition employee claims and employee benefits in the ordinary course of its business.

**E. Debtor's Motion for Interim and Final Orders (I) Finding Utilities Adequately Assured of Payment and (II) Establishing Further Procedures**

64. By this motion, the Debtor seeks interim and final orders finding that the Debtor's utility provides are deemed adequate assured of payment and establishing procedures relating to adequate assurance demands of the Debtor's utility providers. In the ordinary course of business, the Debtor regularly incurs expenses for utility services provided by certain utilities, including telephone and cellular phone service providers (the "Utility Providers"). The approximate monthly charges for the utility services provided by the Utility Providers (as determined using a three month average run rate) totals $7,506.00.

65. On a monthly basis, the Debtor pays amounts due to the Utility Providers. As of the Petition Date, however, the Debtor may have pre-petition accounts payable to certain Utility Providers. To avoid interruption of essential utility services, the Debtor requests that the Court enter an order (i) prohibiting the Utility Providers from altering, refusing, or discontinuing services; (ii) finding that the Utility Companies are adequately assured of payment for post-petition utility services pursuant to Section 366(c)(1)(A) of the Bankruptcy Code by virtue of the establishment of a deposit account in the amount of $3,753.00 (the "Deposit") (which equals

fifty percent (50%) of the Debtor's estimated monthly utility costs as determined using a three month average run rate); (iii) establishing procedures and mechanisms under which the parties may determine adequate assurance of future payment; and (iv) authorizing the Debtor to supplement, as necessary, the list of Utility Providers and providing that any newly added Utility Provider will be subject to the terms of the order.

66.     Such relief is necessary to enable the Debtor to continue its business operations uninterrupted by threats of potential termination of, or suspension or interruption in its utility services. Because the Utility Providers administer essential services to the Debtor's facilities, any interruption in utility services could irreparably disrupt the Debtor's business operations.

67.     The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers in a timely manner and expects that it will have sufficient funds with which to satisfy it to pay promptly all obligations to the Utility Providers for post-petition utility service on an ongoing basis and in the ordinary course of business.

68.     Nevertheless, to provide additional adequate assurance of payment, the Debtors propose to provide the Utility Providers with adequate assurance by funding the Deposit, a sum equal to fifty percent of the Debtors' estimated monthly utility costs, into a segregated, interest bearing account.

**F.      Debtor's Application for Entry of an Order Authorizing the Employment and Retention of DLS Claims Administration, LLC as Claims, Noticing, and Balloting Agent for the Clerk of the Court and Approving Related Agreement**

69.     The Debtor has more than two hundred creditors and accordingly is required to have a claims agent under Local Rule 2002-1(f). I believe that the most effective and efficient manner to notice creditors and parties in interest is for the Debtor to engage an independent third party to act as the Debtor's notice and claims agent. The Debtor may also require the services of

an agent to administer votes under a plan of reorganization. Accordingly, the Debtor seeks authority to retain and employ DLS Claims Administration, LLC ("DLSCA") as its claims, noticing, and balloting agent to assist the Debtor in, among other things, distributing notices, as necessary, and processing other administrative information related to this Case.

70. DLSCA specializes in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases. The Debtor chose DLSCA based on the competitiveness of its fees and its belief that DLSCA is well qualified to serve as claims, noticing, and balloting agent in this Case and its employment will provide the Debtor with efficient management of the claims, noticing and balloting processes in this Case leaving the Debtor's management and professionals to focus on the Debtor's reorganization efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____

Respectfully submitted,

SHAWN O'CONNOR
Chief Executive Officer
Entelos, Inc.