# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Entelos, Inc.[1] | ) | Case No. 11-12329-PJW |
| | ) | |
| Debtor. | ) | **Bid Procedures Hearing Date:  TBD** |
| | ) | **Bid Procedures Objection Deadline: TBD** |

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 365, AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR

## (I) AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) SCHEDULING AN AUCTION AND SALE HEARING; (C) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSIGNED; AND (D) GRANTING CERTAIN RELATED RELIEF; AND

## (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) ESTABLISHING ASSUMPTION PROCEDURES FOR CERTAIN ADDITIONAL EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Entelos, Inc. (the "Debtor"), as debtor in possession, by and through its undersigned

counsel,  moves this Court, pursuant to sections 105, 363 and 365 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order (the "Bidding

Procedures Order"), substantially in the form attached hereto as Exhibit A, (A) establishing

bidding and auction procedures (the "Bidding Procedures") in connection with the potential sale

of substantially all of the Debtor's assets (the "Assets") free and clear of all claims and any other

interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and

encumbrances of any kind whatsoever (collectively, the "Interests"), except to the extent

---

[1]  The last four digits of the debtor's federal tax identification number are 5818.

identified in a Successful Bidder's (as defined below) bill of sale; (B) scheduling an auction (the "Auction") and setting a date and time for a sale hearing (the "Sale Hearing") for the sale of Assets (the "Sale"), and approving the form and manner of notice thereof; (C) establishing procedures for noticing and determining cure amounts for executory contracts ("Executory Contracts") and unexpired leases ("Unexpired Leases") to be assigned in connection with the Sale (the "Cure Procedures"); and (D) granting certain related relief. The Debtor further requests that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "Sale Order"), substantially in the form attached hereto as Exhibit D, (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Successful Bidder's bill of sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Unexpired Leases; and (C) establishing assumption and cure procedures (the "Assumption and Cure Procedures") with respect to certain other Executory Contracts and Unexpired Leases. In support hereof, the Debtor asserts as follows:

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction over this Motion under 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## II. FACTUAL BACKGROUND

2.  On July 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in an effort to preserve and maximize the value of its estate, thereby commencing the above-captioned bankruptcy case (the "Case").

### A. Overview Of The Debtor's Business.

3.      Entelos is a privately-held Delaware corporation.

4.      Entelos is a cutting edge software and services company that provides customized solutions to complex problems in healthcare by the creation and use of innovative tools and products. Generally, Entelos consults for and collaborates with pharmaceutical and consumer product companies, as well as governmental and research organizations, worldwide. Entelos is a leader in the development and application of mechanistic disease models and biosimulation methodologies designed to optimize clinical trial design, identify biomarker patterns, characterize sub-populations, and improve efficiency in patient management and healthcare systems. Entelos' mechanistic disease models allow for a deeper exploration of novel target biology and hypotheses testing in the absence of supporting human clinical data.

5.      Combining biology, engineering, and informatics,[2] Entelos is a cutting-edge software and services company that simulates experiments in large-scale computer models (*in silico*),[3] rapidly testing what would otherwise take months or years to do in the laboratory or clinic. As the leader in *in silico* biosimulation modeling, Entelos is a life sciences company applying next-generation predictive technologies across multiple markets in research and development of healthcare and consumer products to dramatically lower the risk, time, and cost of product development. Entelos' customers save both time and money by optimizing clinical programs and research and development through virtual population simulations, focusing on the best inclusion criteria, dosing, timing, and markers to obtain meaningful trial outcomes. Through this process, Entelos provides advanced knowledge of a compound's likely safety

---

[2] "Informatics" is the application of information science and statistical techniques to the management of information.

[3] *"In silico"* means performed on computer or via computer simulation, as opposed to *"in vivo,"* meaning performed on living organisms.

profile and effectiveness, creating an opportunity to shift termination or advancement decisions to occur earlier in the drug and product development process, and thereby improve overall drug and product development efficiency.

6.      Seeking to build the most accurate models of human disease possible, Entelos currently provides customized products, technology and research services. Entelos has expertise in the following areas: Toxicity and Safety, Respiratory, Immunology/Inflammation, Metabolism, Cardiovascular, Epidermis and Erythropoiesis.[4]

7.      Entelos' *in silico* disease technology, known as PhysioLab®, is used to select and develop compounds, assess safety, optimize clinical trials and combination therapies, and reprofile drugs. The PhysioLab® platforms, "virtual human" technology, and toxicology reference systems are highly predictive and assist clients to develop safer and more effective drugs and personal care products. PhysioLab® research teams work closely with a broad network of experts to build, refine, and validate each disease- and therapeutic area-specific PhysioLab® platform. PhysioLab® platforms are large scale, computer-based mathematical models of physiology. With PhysioLab® virtual patients and virtual populations, Entelos is able to simulate the *in vivo* effects of drugs and optimize the effects and protocols before running time-consuming and expensive clinical studies.

8.      Entelos' PhysioLab® platforms simulate complex biological systems *in silico*, enabling a novel way to perform biology-based research and development. The success of PhysioLab® platforms as a systems biology framework lies in Entelos' cutting-edge proprietary modeling software that allows researchers to translate biology into mathematics; scalable, hypothesis-driven approaches to modeling biology and pathophysiology;[5] virtual patients and

---

[4] "Erythropoiesis" is the formation or production of red blood cells.
[5] "Pathophysiology" is the scientific study of changes associated with or resulting from disease or injury.

populations to explore the range of human physiology; and model-based research and development techniques.

9. PhysioLab® technology is protected by patents (issued and pending) related to its underlying software, specific disease models, and the scientific methodologies developed for its application.

**B.      Pre-Petition Capital Structure**

10. Entelos was incorporated in the State of California on July 31, 1996.

11. On April 4, 2006, Entelos reincorporated from the State of California into the State of Delaware.

12. From April 2006 until June 2009, Entelos' common stock was traded on the Alternative Investment Market of the London Stock Exchange (the "AIM Exchange"). Entelos, with the support of its stockholders, delisted its common stock from the AIM Exchange effective as of July 1, 2009.[6]

13. Entelos' capital stock is held by venture firms, other life sciences companies, and individual investors. Imperium Master Fund, Ltd. ("Imperium") holds 3,990,537 shares of the Class A Common Stock in Entelos, which is approximately 6.07% percent of the shares of Class A Common Stock. Imperium also holds all of the 300,459,823 shares of Series A Preferred Stock.

14. As of the Petition Date, the Debtor owed first priority, secured debt to Imperium in the approximate amount of $8,442,000, inclusive of interest accrued though July 22, 2011, plus interest thereafter and all costs, fees, expenses (including reasonable attorneys' fees and legal expenses) and other charges (the "Prepetition Obligations"), which consists of the

---

[6] Entelos is the parent company of the following non-debtor subsidiaries: Entelos (UK) Ltd., Eratosthenes, Inc. and Digitalself, Inc. The non-debtor subsidiaries do not have any current business operations. The non-debtor subsidiaries have little or no assets.

following notes: (1) Senior Term Note dated April 15, 2010, in the original principal amount of

$6,000,000,[7] (2) Supplemental Term Note, dated June 2, 2011, in the original principal amount

of $500,000, (3) Second Supplemental Term Note, dated June 24, 2011, in the original principal

amount of $850,000, and (4) Secured Term Promissory Note, dated July 22, 2011, in the original

principal amount of $300,000 (as the same has heretofore been amended, supplemented,

modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the

"Existing Financing Agreements").

15.     Pursuant to a Security Agreement dated as of December 21, 2007, as amended on

January 1, 2008, and the Amended and Restated Security Agreement dated as of April 15, 2010,

the Existing Financing Agreements are secured by substantially all of Entelos' assets.

16.     As of the Petition Date, the Debtor also owed unpaid pre-petition unsecured

claims in excess of $10 million.

### C.     Events Leading to the Debtor's Bankruptcy Filing

17.     In 2008,[8] Entelos had revenue of $18.12 million and operating costs of $30.64

million, resulting in a loss from operations of $12.52 million.

18.     As of December 31, 2008, Entelos had approximately $2 million in cash.

19.     As of December 31, 2008, Entelos had total assets with a book value of $8.3

million and total liabilities of $13.2 million.

---

[7] Imperium and Entelos are parties to that certain Securities Purchase and Loan Agreement, dated as of December 21, 2007, pursuant to which Imperium purchased from Entelos a senior secured note with a purchase price of $1,500,000.00 and a stated principal amount at maturity of $1,698,758.28 (the "Prior Note"), and two original issue secured convertible debentures with a purchase price of $3,000,000.00 and $2,000,000.00, respectively, and a stated principal amount at maturity of $3,314,139.00 and $2,209,426.00, respectively (the "Convertible Debentures"). Entelos defaulted in the payment under the Prior Note. Thereafter, Imperium and Entelos entered into an Exchange Agreement dated as of March 25, 2010, to restructure the Prior Note and the Convertible Debentures by converting the outstanding principal balances on the Prior Note and Convertible Debentures, and all accrued and unpaid interest and any applicable redemption premium and/or penalties thereon, into the Senior Term Note and shares of Series A Preferred Stock.

[8] Calendar year 2008 is the last year for which the Debtor has audited financial statements.

20.     As of December 31, 2008, Entelos had accumulated a shareholders' deficit of $87.15 million.

21.     Based on its financial performance through 2008, Entelos' auditors stated that "[g]iven the Company's recurring net losses, negative cash flows from operations, stockholders' deficit, negative working capital, and the uncertainty related to its debt covenants, there is substantial doubt about the ability of the Company to continue as a going concern."

22.     Market conditions in the pharmaceutical industry have deteriorated in recent years.  For example, it has been reported that overall research and development ("R&D") investment by the top 10 pharmaceutical companies fell $421 million from 2008 to 2009 (from $57.54 billion to $57.12 billion).  See http://www.pharmaceutical-market-research.com/publications/pharmaceutical_companies/pharmaceutical_companies_performance_tables.html.  Reuters noted that pharmaceutical R&D spending decreased by $2.0 billion dollars from 2009 to 2010.  See http://www.reuters.com/article/2011/06/26/pharmaceuticals-rd-idUSL6E7HO1BL20110626  (June 26, 2011).

23.     Entelos continued to operate with limited liquidity in a difficult pharmaceutical industry.

24.     For the first six months of 2011, the Debtor received, on a cash basis, $2.6 million in revenue (based on the Debtor's unaudited financial statements for such period) and $5.7 million in operating expenses.

25.     The Debtor also believes that its prior executive officers made strategic mistakes and mismanaged the Debtor and its resources, thereby thrusting the Debtor into a severe liquidity crisis, which has not lessened.

26. With little revenue in a stingy capital market, the Debtor has been unable to generate adequate liquidity from revenue or financing to pay its prepetition obligations.

27. On or about June 17, 2011, the landlord of the Debtor's headquarters property located at 110 Marsh Drive, First Floor, Foster City, California (the "Premises") instituted an unlawful detainer and eviction action against the Debtor in the Superior Court of California, San Mateo County (the "Superior Court"), which case was assigned Case No. Civ 204137 (the "Landlord Action"). On July 21, 2011, the parties to the Landlord Action attended mediation relative to the Landlord Action but were unable to resolve their disputes. An unlawful detainer hearing in the Landlord Action is scheduled for hearing before the Superior Court on July 25, 2011 at 9:00 a.m. (Pacific).

28. On July 22, 2011, the Debtors also received a default notice from Imperium (the "Default Notice"). Imperium advised the Debtor that various Events of Default have occurred and are continuing to occur under the Promissory Notes, including, without limitation, a material adverse change to (a) the financial condition or results of Entelos' operations or (b) Entelos' cash balances or cash flows (collectively, the "Specified Defaults"). As a result of the occurrence of the Specified Defaults, Imperium declared that it was (i) exercising its right pursuant to Section 3(a) of the Promissory Notes to cause the Promissory Notes to be redeemed at the redemption price set forth in such Section 3(a) and (ii) notifying the Debtor that all Promissory Notes shall accrue certain default interest.

**D.      Prior Efforts to Raise Capital or Sell the Business.**

29. In 2009, Entelos engaged Seven Hills Partners, LLC ("Seven Hills"), a boutique investment bank focused on financings and mergers & acquisitions for growth companies, to

raise capital (debt or equity) for, or find an acquirer for, Entelos. Seven Hills' efforts did not result in any transaction.

### E. The Stalking Horse Agreement

30.     The Debtor and Imperium (together with its designee or assignee, the "Purchaser") propose to entered into that certain Bill of Sale (the "Stalking Horse Agreement") for the purchase of the Assets, a copy of which is attached as Exhibit B, whereby the Purchaser agreed to submit a credit bid for substantially all of the Debtor's assets. The Stalking Horse Agreement provides the Debtor with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtor with a floor against which other bidders can submit competing bids through an auction process.

31.     The Stalking Horse Agreement also provides certain additional benefits that will assist in conducting an orderly and efficient sale process for the benefit of the Debtor's constituents. First, the Stalking Horse Bidder has agreed to pay the cure obligations in connection with the assumption and assignment of Executory Contracts and Unexpired Leases to the extent such leases and contracts are sold to Purchaser.

32.     Importantly, the Stalking Horse Bidder is not seeking the payment of any break-up fee or expense reimbursement in the event that another bidder purchases the Debtor's assets at auction, which are customary protections often provided to stalking horse bidders.

### F. Purchaser is in "Insider"

33.     Imperium owns 100% of the Series A Preferred Stock of the Debtor, and 6% of the Series A Common Stock of the Debtor. By and through its equity interest in the Debtor, Imperium has designated one member of the Debtor's Board of Directors and has the ability to control the voting on an additional three members of the five-member Board of Director.

### G. The DIP Financing

34. In connection with the Chapter 11 Cases, Entelos, as borrower (in such capacity, the "Borrower"), and its non-debtor subsidiaries Entelos (UK) Ltd. ("Entelos UK"), Eratosethes, Inc. ("Eratosethes") and Digitalself, Inc. ("Digitalself", and together with Entelos UK and Eratosethes, collectively, the "Guarantors"), Imperium and Imperium Advisers, LLC, in its capacity as collateral agent for Imperium (in such capacity, "Collateral Agent") have entered into that certain Ratification and Supplemental Credit Agreement (the "DIP Facility Agreement").

35. Pursuant to the DIP Facility Agreement, the DIP Facility Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $1.7 million (the "DIP Facility").

36. The DIP Facility will be used to, among other things, provide the Debtor with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. The Purchaser shall have the ability to credit bid all amounts outstanding under the DIP Facility, as well as the right to increase its credit bid to include all or a portion of the pre-petition secured debt owing by Debtor to Purchaser in accordance with the terms of the Stalking Horse Agreement.

### H. Proposed Timeline for Sale of Assets

37. Pursuant to the DIP Facility Agreement, the Debtor, in the exercise of its business judgment, requests that this Court schedule (i) the Bidding Procedures Hearing during the "first" day" hearings, and (ii) the Sale Hearing approximately forty-five (45) days after the Petition Date. Consistent with this requirement, the Debtor proposes the following timeline for conducting the sale process:

| Action | Deadline/Hearing |
|--------|------------------|
| Bidding Procedures Hearing | First Day Hearing (**July 26, 2011**)[9] |
| Proposed Bid Deadline | 5 business days before auction (Friday, **August 26, 2011**) |
| Auction | 39 days after petition date (Friday, **September 2, 2011**) |
| Sale Hearing | 45 days after petition date (Thursday, **September 8, 2011**) |
| Consummation of Sale | 46 days after petition date (Friday, **September 9, 2011**) |

38.     Given their financial condition, liquidity and prior marketing efforts, the Debtor

believe that the proposed timeline is sufficient to complete a fair and open sale process

(especially in light of the absence of any breakup fee or expense reimbursement) that will

maximize the value received for the Debtor's assets.  The proposed timeline will provide the

Debtor with sufficient time to reach out to prospective purchasers in advance of the Proposed

Bid Deadline to maximize the value of their assets.

### I.     The Stalking Horse Agreement

39.     A summary of the terms of the Stalking Horse Agreement is as follows:[10]

- Purchase Price.  The aggregate consideration for the Acquired Assets (the "Purchase Price") shall equal the following, as calculated on the Closing Date: an amount equal to the outstanding amount owing under the DIP Facility, which debt the Purchaser shall credit bid for the Acquired Assets, the "Credit Bid Amount"), plus (ii) all Cure Amounts paid or to be paid by the Purchaser; plus (iii) the Assumed Liabilities.  In the event that one of more qualified bids are received by the Debtor such that an auction is conducted for the Acquired Assets (defined below), Purchaser shall have the right, in its discretion, to increase the Credit Bid Amount to include all or any portion of the Pre-Petition Obligations.

---

[9] Courts in this District have entered bidding procedures orders at the first day hearing when appropriate.  See, e.g., In re: DSI Holdings, Inc., Case No. 11-11941, Order (D.I. 64) (Bankr. D. Del.  July 21, 2011) (Carey, J); In re: American Home Mortgage Holdings, Inc., Case No. 07-11047, Order (D.I. 113) (Bankr. D. Del. Aug. 9, 2007) (Sontchi, J.).  Here, such relief is appropriate because there is no prejudice to unsecured creditors.  The Bidding Procedures contain no breakup fee or expense reimbursement.

[10] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Agreement.

- **Acquired Assets.** At the Closing, the Sellers shall sell, transfer, grant, assign, deliver and convey to the Purchaser free and clear of all Liens, Claims and Interests, and the Purchaser shall purchase, acquire and take assignment and delivery of, all of the Sellers' right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of such Seller as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, certain enumerated properties, rights, and assets, but excluding the Excluded Assets (collectively, the "Acquired Assets").

- **Assumed Liabilities.** At the Closing, the Purchaser shall not assume (other than the Cure Amounts) any obligations or Liabilities from Sellers other than the obligations under the Acquired Contracts falling due or accruing between the date of the Assumption and Cure Notice (as defined below) and the Closing Date and obligations under the Acquired Contracts accruing after the Closing Date with respect to the post-Closing period, plus all of the Pre-Petition Obligations to the extent such obligations were not included in the Credit Bid Amount (all such liabilities and obligations assumed, the "Assumed Liabilities"). The Purchaser's assumption of the Pre-Petition Obligations shall not, by virtue of the assumption thereof, reduce, forgive, eliminate, release or discharge the Debtor's obligations to repay in full the amount of the Pre-Petition Obligations not included in the Credit Bid Amount.

40.     The Stalking Horse Agreement contemplates a going concern sale of the Debtor's Assets with certain Executory Contracts and Unexpired Leases being assumed and assigned to the Purchaser on the Closing Date in accordance with the proposed Assumption and Cure Procedures, as discussed more fully below.

## III.     RELIEF REQUESTED

41.     By this Motion, the Debtor seeks entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) scheduling the Auction and a Sale Hearing with respect to any bid accepted by the Debtor, and approving the form and manner of notice thereof; and (C) establishing the Cure Procedures.

42.     The Debtor also requests that this Court set a Sale Hearing on or about September 8, 2011 (45 days from the Petition Date). At the Sale Hearing, pending the outcome

of the Auction and as set forth in the Bidding Procedures, the Debtors seeks entry of a Sale Order

(A) approving the Sale, free and clear of all Interests; (B) authorizing the assumption and

assignment of certain Executory Contracts and Unexpired Leases; and (C) establishing

Assumption and Cure Procedures for certain Executory Contracts and Unexpired Leases.

## IV.     BASIS FOR RELIEF REQUESTED

### A.     Necessity for Sale

43.     Prior to the commencement of this Chapter 11 case, the Debtor was in default

under the Existing Financing Agreements, and without the proceeds of the DIP Facility, the

Debtor does not have adequate liquidity to fund continued operations.

44.     The Debtor submits that the Sale, along the timeframe proposed herein, will

maximize the recovery prospects for the creditors of the Debtor's estate.  Agreeing to the Sale in

conjunction with the DIP Financing addresses the Debtor's short-term liquidity concerns and

enables the Debtors to restore confidence amongst their customer base.  Accordingly, the Debtor

believe that pursuing the Sale on the timetable set forth herein and in the Bidding Procedures will

enable the Debtor to maximize the value of the Assets.  In  the absence of such a Sale on the

proposed timetable, the Debtor will face further deterioration in the value of the Assets because it

has insufficient liquidity to continue operations.

### B.     The Bidding Procedures[11]

45.     In order to maximize the value of the Assets for the benefit of the Debtor's estate

and its creditors, the Debtor seeks to implement a competitive bidding process that is designed to

generate maximum recovery.  As described more fully in the Bidding Procedures, attached as

Exhibit 1 to the Bidding Procedures Order attached hereto as Exhibit A, the Debtor may sell all

---

[11] Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures, which are attached as Exhibit 1 to the Bidding Procedures Order.

of the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

46.     As described more fully in the Bidding Procedures, the Debtor proposes that competing bids for the Assets be governed by the following:[12]

- **Bid Deadline**. A Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials to the Debtor and the Stalking Horse Bidder not later than 5:00 p.m. (prevailing Eastern Time) on Friday, August 26, 2011 (the "Bid Deadline").

- **Required Bid Materials**. All bids, other than the Stalking Horse Bid, must include the following, among other things (the "Required Bid Materials"):

   (i)    **Acquired Assets**. Any Qualifying Bid must seek to acquire substantially all of the Acquired Assets;

   (ii)   **Same or Better Terms**. The Bid must be on terms that, in the Debtor's business judgment, are substantially the same or better than the terms of the Stalking Horse Agreement. A Bid must include executed transaction documents (the "Competing Transaction Documents") pursuant to which the Bidder proposes to effectuate a competing transaction (a "Competing Transaction"). A Bid shall include a copy of the Stalking Horse Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price);

   (iii)  **Identity**. All Bids must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation;

   (iv)   **Contingencies**. A Bid may not be conditioned on (i) obtaining financing or any internal approval or (ii) on the outcome or review of due diligence;

   (v)    **Proof of Financial Ability to Perform**. A Bid (other than the Stalking Horse Agreement) must provide written evidence that the Debtor reasonably concludes demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under the Acquired Contracts to be assumed and assigned in the Competing Transaction. Such information should include, among other things, the following:

---

[12] The following description of the Bidding Procedures is only a summary, which is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

(a)     contact names and telephone numbers for verification of financing sources;

(b)     evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Transaction;

(c)     the Bidder's current financial statements (audited if they exist and, if unaudited, most recent audited financial statements); and

(d)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Competing Transaction;

(vi)     <u>Irrevocable</u>.  A Bid made by any Bidder other than the Purchaser must be irrevocable through the Auction; <u>provided</u> that if such Bid is accepted as the Highest or Best Bid or the Backup Bid (as defined in the Bidding Procedures), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures;

(vii)     <u>Identification of Executory Contracts and Unexpired Real Property Leases</u>.  The Bid shall identify with particularity the Debtor's executory contracts and unexpired leases with respect to which the Bidder seeks to receive an assignment and any designation rights;

(viii)     <u>Corporate Authority</u>.  Written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; <u>provided</u> that if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor and the Purchaser of the approval of the Competing Transaction by the equity holder(s) of such Bidder; and

(ix)     <u>Adequate Assurance Information</u>.  The Bid shall include sufficient financial or other information (the "<u>Adequate Assurance Information</u>") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the Bidder in connection with the proposed transaction and Bidder's agreement that such Adequate Assurance Information can be faxed or emailed to any counterparties to such contracts or leases (or their counsel) within 24 hours of submission of the Bid; provided, however, that the counterparties to such contracts and leases must keep any information marked in the

Adequate Information as confidential (the "Confidential Information") provided that the Confidential Information may be referred to and quoted in any hearing before the Bankruptcy Court held to consider the assumption and assignment of such contract or lease and further provided, however, that to the extent that any party desires to introduce the Confidential Information as an exhibit at any hearing, such party shall request that the Bankruptcy Court treat the Confidential Information as confidential, unless the Debtor and the applicable Bidder have agreed that such confidential treatment by the Bankruptcy Court is not necessary. The Bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder." The Debtor shall provide notice of any Qualified Bid to the Purchaser within two (2) Business Days of qualifying a Bid. For the avoidance of doubt, the Stalking Horse Agreement shall constitute a Qualified Bid by the Purchaser and the Purchaser shall be deemed a Qualified Bidder. The Purchaser shall have standing to contest the Debtor's determination of each Qualified Bid and Qualified Bidder.

In the event that any Bid is determined by the Debtor not to be a Qualified Bid, the Debtor shall cause such Bidder to be refunded its Bid Deposit and all accumulated interest thereon within three (3) business days after the Bid Deadline or as soon as reasonably practicable thereafter.

- Minimum Bid Amount. Any Qualifying Bid (other than the Stalking Horse Agreement) at the Auction must be higher and better than the offer of the Purchaser under the Stalking Horse Agreement and that is not less than the sum of (A) the Credit Bid Amount and the Cure Amounts in cash; and (B) $50,000 in cash (the "Minimum Bid Amount").

- Auction. If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtor and the Stalking Horse Bidder, the Debtor may conduct an auction (the "Auction") with respect to all or some of the Assets. The Auction shall be conducted at the offices of Reed Smith LLP, 1201 Market Street; Suite 1500; Wilmington, DE 19801 (the "Auction Site") at 10:00 a.m. (Eastern) on Friday, September 2, 2011 (the "Auction Date"), or such other place and time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above. Prior to moving the Auction Date, the Debtor shall consult with the Stalking Horse Bidder.

**C.** **Notice of Bidding Procedures, Auction and Sale**

47.     Notice of Sale Hearing.  On the date the notice of motion and hearing with respect to this Motion is filed (or as soon thereafter as is practicable), the Debtor shall serve this Motion and all exhibits hereto, including the Stalking Horse Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) counsel to Imperium, (c) the creditors listed on the Debtor's consolidated list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petitions; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the assets of the Debtor to the extent reasonably known to the Debtor; (f) each of the Debtor's landlords and each of the notice parties identified in the Unexpired Leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtor or their advisors as a potential purchaser of the Assets; and (i) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

48.     Sale Notice.  Within two (2) business days of the entry of the Bidding Procedures Order (the "Mailing Date") or as soon thereafter as practicable, the Debtor shall serve by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached hereto as Exhibit C, and the Bidding Procedures Order upon the Sale Notice Parties.

49.     Post Auction Notice.  As soon as practicable after the conclusion of the Auction, the Debtor shall file, but not serve, a notice (the "Post-Auction Notice") identifying any successful bidder (the "Successful Bidder").

**D. Designation Rights Under Stalking Horse Agreement Procedure for Assuming or Rejecting Contracts and Unexpired Leases**

50.     The Stalking Horse Bidder has not yet determined exactly which Executory Contracts and Unexpired Leases it will assume. Pursuant to the Stalking Horse Agreement, on or before the Closing, the Purchaser may update Schedule A to the Stalking Horse Agreement to add or remove an Executory Contract or Unexpired Lease to or from such schedule (the extent such Executory Contract or Unexpired Lease already has not been rejected by the Debtor). Any Executory Contract or Unexpired Lease added to Schedule A shall become an Acquired Contract or Acquired Unexpired Lease, shall be deemed an Acquired Asset for all purposes of the Stalking Horse Agreement, and all obligations arising under such Executory Contract or Unexpired Lease which would have been Assumed Liabilities if such Executory Contract or Unexpired Lease had been an Acquired Contract as of the date of the Stalking Horse Agreement shall be Assumed Liabilities for all purposes of the Stalking Horse Agreement. No Executory Contract or Unexpired Lease may be removed from Schedule A after the Bid Deadline.

**E. The Assumption and Cure Notice Procedures**

51.     The Debtor propose the following procedures for notifying counterparties to Executory Contracts and Unexpired Leases of potential assumption and Cure Amounts (as defined below) with respect to those Executory Contracts and Unexpired Leases that the Debtor may seek to assume and assign on the Closing Date.

52.     Within seven (7) business days of the filing of this Motion, the Debtor will file a notice identifying all Executory Contracts and Unexpired Leases that may be assumed and assigned in connection with the Sale (the "Assumption and Cure Notice"), and serve the Assumption and Cure Notice on all non-debtor parties to the Executory Contracts and Unexpired Leases (the "Contract Notice Parties").

53. The Assumption and Cure Notice shall state the cure amounts that the Debtor believes are necessary to assume such Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code as of the date of the Assumption and Cure Notice (the "Cure Amount") and notify the non-debtor party that such party's Executory Contract or Unexpired Lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the Auction. The Assumption and Cure Notice also shall contain information with respect to the Stalking Horse Bidder's proposed adequate assurance of future performance and information regarding how a non-debtor party to an Executory Contract or Unexpired Lease may obtain additional information regarding the Stalking Horse Bidder (the "Stalking Horse Adequate Assurance Information"). The Assumption and Cure Notice shall set a deadline by which the non-debtor party may file an objection to the proposed assumption and assignment, the Cure Amount or the Stalking Horse Adequate Assurance Information. The Debtor requests that this Court set the deadline to object to any proposed assumption and assignment, Cure Amount or to the Stalking Horse Adequate Assurance Information at approximately fourteen (14) days after service of the Assumption and Cure Notice. The Debtor proposes that if they file an amended Assumption and Cure Notice setting forth amended Cure Amounts, any parties affected by the amendment shall have fourteen (14) days after service of the amended Assumption and Cure Notice to object to the amended Cure Amount. The Assumption and Cure Notice shall also provide that objections to any proposed assumption and assignment, Cure Amount or to the Stalking Horse Adequate Assurance Information will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor in consultation with the Court. In the event that the Successful Bidder is not the Stalking Horse Bidder, the Debtor proposes that any objections regarding adequate assurance of future performance may be raised at the Sale Hearing.

54.     At the Sale Hearing, the Debtor shall present any evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Unexpired Leases to be assumed and assigned on the Closing Date to any Successful Bidder.  For the foregoing reasons, the Debtor believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

55.     After the Closing Date, the Debtor shall file with this Court a post-closing notice that identifies the Executory Contracts and Unexpired Leases which were assumed and assigned to the Successful Bidder as of the Closing Date.

56.     Given that all parties to Executory Contracts and Unexpired Leases will receive the Assumption and Cure Notice as set forth above and have an opportunity to object to the assumption and assignment of their particular Executory Contract and Unexpired Lease and the applicable Cure Amount in connection with the Sale Hearing, the Debtor respectfully submits that the proposed assumption procedures will streamline the Debtor's ability to transfer such Executory Contracts and Unexpired Leases to the Successful Bidder or its designee.  Upon receipt of the Assumption and Cure Notice, parties will know that their respective Executory Contract or Unexpired Lease is subject to being assumed and assigned and the proposed Cure Amount with respect thereto (and the identity of the Stalking Horse Bidder).  The Assumption and Cure Notice affords parties-in-interest fair notice of the potential transfer of the applicable Executory Contracts and Unexpired Leases and affords parties-in-interest their due process rights with respect to notice and the opportunity to be heard in the event of objections.  For the foregoing reasons, the assumption procedures set forth herein should be approved and the Debtor

should be authorized to assume and assign the Executory Contracts and Unexpired Leases consistent with the terms of such procedures, pursuant to section 365 of the Bankruptcy Code.[13]

**F.    Applicable Authority**

57.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtor demonstrateS a sound business justification therefore. See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

58.    As discussed above, the Debtor has sound business justifications for selling the Assets at this time. The Debtor remains in default under the terms of the Existing Financing Agreements and continues to suffer from insufficient liquidity. A sale of the Debtor's assets will result in the transfer of the business to a financially stable buyer with the ability to fund the Debtor's going-forward capital requirements. Accordingly, the Debtor submits that the proposed sale will enable them to both address their liquidity issues, maximize value of the Assets, save employees' jobs, and restore customer confidence in the marketplace. Accordingly, a sale consistent with the timeframe proposed herein is necessary to maximize the value of their Debtor's assets for the benefit of all creditors in these Chapter 11 Cases.

---

[13] Certain of the leases and contracts may contain provisions that restrict, prohibit, condition or limit the assumption and/or assignment of a lease or contract. The Debtor reserves the right to argue that such clauses are unenforceable anti-assignment or ipso facto clauses under section 365 of the Bankruptcy Code.

### 1. The Bidding Procedures Are Fair and Designed to Maximize the Value Of the Assets

59.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtor believes that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.

60.     Most importantly, the Bidding Procedures do not contain any protections for the Stalking Horse. There is <u>no</u> breakup fee and <u>no</u> expense reimbursement.

61.     The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures will then provide the Debtor with the opportunity to consider all competing offers and to select the highest and best offer for the sale of substantially all of the Assets.

62.     The Debtor request this Court's approval of the Bidding Procedures, including the proposed timetable for an Auction and a Sale Hearing.

### 2. Approval of the Sale Is Warranted Under Section 363(b) of the Bankruptcy Code

63.     Section 363(b)(1) provides, in relevant part, that a "trustee, after notice and a hearing, may . . . sell . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. Section 363(b)(1).

64.     If a sound business purpose exists, the sale of property of the estate should be authorized pursuant to Section 363 of the Bankruptcy Code. <u>See, e.g.</u>, <u>Meyers v. Martin (In re</u>

Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D.Del. 1991).

65.     Once the Debtor articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

66.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

67.     The Debtor has a sound business justification for selling the Assets at this time. Based on a the Debtor's liquidity constraints and their ongoing and future business prospects, the Debtor's management has concluded that a prompt Sale of the Assets in accordance with the procedures set forth in the Bidding Procedures is the most appropriate alternative available to maximize recoveries to the Debtor's estate.  Maximization of the value of the Assets is a sound business purpose warranting authorization of any proposed Sale.  For the reasons discussed

herein, the Debtor believes that an expedited sale of the Assets is the best way to maximize value for the benefit of creditors and stem any further deterioration of the going concern value of the company.

68.     The Debtor has proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their business for the benefit of the Debtor's estates and their creditors.  There is no breakup fee or expense reimbursement for the Stalking Horse. The Sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

69.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in this Chapter 11 Case, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale.  Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtor and its creditors and parties-in-interest.

### 3.     The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Interests

70.     Section 363(f) of the Bankruptcy Code permits the Debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As section 363(f) of the Bankruptcy Code is

stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).

71.    In the event the Stalking Horse Bidder is the Successful Bidders, they will have credit bid amounts outstanding under the DIP Facility and (potentially) the Prepetition Obligations and released their liens at Closing to the extent of such bid.  In the event that the Stalking Horse Bidder is not the Successful Bidder, Imperium will be paid from the cash proceeds of the Sale to the Successful Bidder.  With respect to any other bona fide and allowed Interests, the Debtor believes they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of the conditions under section 363(f) of the Bankruptcy Code.

### 4.    A Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

72.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

73.    The Stalking Horse Agreement was negotiated at arm's length, with both parties represented by their own counsel.  Additionally, the Debtor will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all of the Assets had negotiated at arm's length in good faith.

74.    Accordingly, the Sale Order will include a provision that the Successful Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the

Bankruptcy Code. The Debtor believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Assets and that closing of the same will occur promptly.

### 5. The Sale, Assumption and Assignment of Executory Contracts and Unexpired Leases

75. Section 363(f) of the Bankruptcy Code provides, in certain instances, that a debtor in possession may sell "property of the estate" outside the ordinary course of business "free and clear of any interest in such property of an entity other than the estate." See 11 U.S.C. § 363(f). "Property of the estate" includes all "legal or equitable" interests of a debtor in property. See 11 U.S.C. § 541(a). Thus, a trustee may sell various types of property interests, including interests in unexpired leases (and executory contracts) under Section 363(f). See In re Rickel Home Ctrs., Inc., 209 F.3d 299, 300-01 (3d Cir. 2000) (regarding sale of unexpired leases under Section 363); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998) (regarding sale of executory contracts under Section 363).

76. Where a trustee sells an unexpired lease, the sale is subject to the terms of Section 365 of the Bankruptcy Code. See Rickel, 209 F.3d at 299; Krebs, 141 F.3d at 497-98.

77. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St.

P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a Debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

78.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See Rickel, 209 F.3d 299 ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

79..     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).

80.     The Bankruptcy Code does not define the phrase "adequate assurance of future performance." See In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007). The Third

Circuit, however, has recognized that Congress adopted the phrase "adequate assurance of future performance" as employed in § 2-609(1) of the Uniform Commercial Code. See id.; Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001). The phrase "adequate assurance of future performance" is not a term of art, but rather must be given a "'practical, pragmatic construction.'" Fleming, 499 F.3d at 307 (quoting Cinicola, 248 F.3d at 120 n.10). Therefore, what constitutes "adequate assurance of future performance" will be determined by "consideration of the facts." Id.

81. The Third Circuit has declared that the requirement of "adequate assurance" of future performance was "not intended" to give any non-debtor contract party "greater rights in a case under the [Bankruptcy Code] that he has outside" of the Bankruptcy Code. See Cinicola, 248 F.3d at 120 n.10 (quoting Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93d Cong., 1st Sess. Pt. II 156-57 (1973)).

82. In addition, although there is no single solution for adequate assurance in every case, "'the required assurance will fall considerably short of an absolute guarantee of performance'". Id. (quoting In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1988)); see generally In re ANC Rental Corp., Inc., 277 B.R. 226, 238 (Bankr. D.Del. 2002) (non-debtor parties had adequate assurance of future performance even though assignee was a holding company that had never operated a rental concession business because holding company projected annual savings of $4.5 million thereby rendering it much more financially secure than the debtor).

83. Information will be included in the Assumption and Cure Notice as part of the Stalking Horse Adequate Assurance Information, which will include contact information on where additional adequate assurance information can be obtained. Adequate assurance of future

performance with respect to any Successful Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing. Upon closing, the Stalking Horse Bidder will have financial resources that are more than sufficient to perform under any Executory Contracts or Unexpired Leases they seek to have assumed by the Debtor. Moreover, if necessary, the Debtor will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidder or any Successful Bidder, and their willingness and ability to perform under the Executory Contracts and Unexpired Leases to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Executory Contracts and Unexpired Leases that it seeks to assume.

84.     Accordingly, the Debtor respectfully submit that the procedures proposed herein are appropriate and reasonably tailored to provide the non-debtor parties to the Debtor's Executory Contracts and Unexpired Leases with adequate notice in the form of the Assumption and Cure Notice of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

85.     Accordingly, this Court therefore should have a sufficient basis to authorize the Debtor to assume and assign Executory Contracts and Unexpired Leases as may be set forth in any Successful Bidder's asset purchase agreement.

### 6. Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

86.    Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." The Debtor request that any Sale Order be effective immediately by providing that, to the extent applicable, the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

### Notice

87.    No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases. The Debtor shall serve a copy of this Motion by first class mail upon (a) the United States Trustee for the District of Delaware; (b) counsel to Imperium; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petitions; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the assets of the Debtor to the extent reasonably known to the Debtor; (f) each of the Debtor's landlords and each of the notice parties identified in the real property leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtor as a potential purchaser of the Assets; and (i) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## **No Prior Request**

88.    No prior motion for the relief requested herein has been made to this Court or any other Court.

WHEREFORE, the Debtor respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, (A) approving the Bidding Procedures; (B) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (C) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate.  Additionally, the Debtor request that at the Sale Hearing this Court enter a Sale Order, subject to the result of the Auction and to the Bidding Procedures, (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Unexpired Leases; (C) authorizing the Assumption Procedures; and (D) granting such other and further relief as this Court deems appropriate.

Wilmington, Delaware
Dated:   July 25, 2011

Respectfully submitted,

REED SMITH LLP

By:    /s/ Timothy P. Reiley
       Kurt F. Gwynne (No. 3951)
       Richard A. Robinson (No. 5059)
       Timothy P. Reiley (No. 5435)
       1201 Market Street; Suite 1500
       Wilmington, DE 19801
       Phone:  (302) 778-7500
       Fax:  (302) 778-7575
       Email: kgwynne@reedsmith.com
              rrobinson@reedsmith.com
              treiley@reedsmith.com


Proposed Counsel for the Debtor in Possession