# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENTELOS, INC.,[1] | Case No. 11-12329 (____) |
| Debtor. | |

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION AND (V) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Entelos, Inc. (the "Debtor," "Entelos" or the "Borrower"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for the entry of interim and final orders (respectively, the "Interim Order" and "Final Order" and together, the "DIP Orders") authorizing the Debtor to, among other things: (i) obtain post-petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code in the amount of up to $1.7 million (the "DIP Facility"), by entering into that certain Ratification and Supplemental Credit Agreement (the "DIP Facility Agreement"),[2] by and among Entelos, Inc., a Delaware corporation as borrower; Entelos (UK) Ltd. ("Entelos UK"), a limited company registered in England and Wales, Eratosethes, Inc. ("Eratosethes"), a Delaware corporation, and Digitalself, Inc., a Delaware corporation ("Digitalself"), as subsidiary guarantors (collectively, Digitalself, Eratosethes and Entelos (UK), the "Guarantors"); Imperium Master Fund, Ltd. a

---

[1] The last four digits of the Debtor's tax identification number are 5818.

[2] A copy of the DIP Facility Agreement is attached hereto as Exhibit A. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Orders or, if not defined therein, in the DIP Facility Agreement.

Cayman Islands company (together with its successors, assigns and transferees, "Imperium" or "Lender"), as lender; and Imperium Advisers, LLC, in its capacity as collateral agent for Imperium (in such capacity, the "Collateral Agent"); (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant liens and a superpriority claim to the Lender as security for the repayment of the DIP Facility; and (iv) grant Adequate Protection Liens to the Collateral Agent, on behalf of the Lender, to the extent that there is any diminution in the value of the Lender's interests in the Pre-Petition Collateral during the pendency of this Chapter 11 case. In support of this Motion, the Debtor relies on the *Declaration of Shawn O'Connor in Support of First Day Motions* filed contemporaneously herewith, and further respectfully represents as follows:

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b).

2.     Venue of this case and the Application in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 327(a), 328 and 1107, Bankruptcy Rule 2014 and Local Rule 2014-1.

## II.   BANKRUPTCY LOCAL RULE 4001-2 CONCISE STATEMENT

4.     Material provisions of the DIP Facility Agreement are set forth in the following sections of the DIP Facility Agreement and/or the Interim Order:[3]

---

[3] The summaries and descriptions of the terms and conditions of the DIP Facility Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Facility Agreement and the Interim Order. In the event that there is a conflict between this Motion and the DIP Facility Agreement or the Interim Order, the DIP Facility Agreement or the Interim Order, as applicable, shall control in all respects.

US_ACTIVE-106798815.7

(a) **Borrower.** The borrower is Entelos, Inc., a Delaware corporation.

(b) **Post-Petition Lender.** The post-petition lender is Imperium. As discussed in greater detail below, Imperium is the proposed stalking horse purchaser of substantially all of the Debtor's assets and the holder of certain of the Debtor's pre-petition secured debt.

(c) **Structure and Amount of DIP Facility.** Subject to the terms and conditions of the DIP Facility Agreement and the DIP Order, the Lender has agreed (a) to advance the DIP Facility to the Debtor in the amounts and at the times set forth in the Budget, (b) in no event shall the aggregate outstanding principal amount of the DIP Facility exceed $1.7 million, (c) if not sooner repaid or demanded, the DIP Facility, together with interest accrued thereon, shall be due and payable on the Termination Date (as defined below) and (d) upon the occurrence of an Event of Default, Imperium shall have no obligation to make, and the Debtor shall not request or have any right to receive, any further disbursements pursuant to the DIP Facility Agreement. See DIP Facility Agreement, § 5.1.

(d) **Use of Proceeds.** All proceeds of the DIP Facility shall be used by the Debtor for general operating and working capital purposes in the ordinary course of business of the Debtor in accordance with the Budget. Unless authorized by the Bankruptcy Court and approved by Imperium in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of the DIP Facility, other than those administrative expense claims and other amounts in accordance with the Budget. See DIP Facility Agreement, § 5.2; Interim Order, ¶ 1.3.

(e) **Creeping Roll-Up.** The DIP Facility affects a "creeping roll-up" of certain of the Debtor's Pre-Petition Obligations. The Debtor is required by the DIP Order to use all Cash Collateral (other than proceeds of the DIP Facility) and other proceeds from any Pre-Petition Collateral to reduce the Pre-Petition Obligations, and shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. See DIP Facility Agreement, § 6; Interim Order, ¶¶ 1.4, 1.5 and 1.6.

(f) **Interest Rate.** The outstanding principal amount of the DIP Facility shall accrue interest at an annual rate equal to twelve percent (12%) prior to the occurrence of an Event of Default and fifteen percent (15%) from and after the occurrence of an Event of Default, in each instance, computed on the basis of a 360-day year. See DIP Facility Agreement § 5.1(c).

(g) **Fees.** Except for the extent of reasonable attorney fees and costs, the DIP Facility Agreement does not provide for the payment of any fees.

(h) **Termination Date.** All obligations under the DIP Facility shall, if not repaid sooner, be immediately due and payable upon the earlier to occur of (a) fifty-five (55) days after the date of the DIP Facility Agreement, (b) the occurrence of an

US_ACTIVE-106798815.7

Event of Default, (c) the date of consummation of the Sale, or (d) the last termination date set forth in the Interim Order, unless the Final Order has been entered prior to such date, and in such event, then the last termination date set forth in the Final Order (the earlier of such dates, the "Termination Date"). See DIP Facility Agreement, § 7.

(i) **_Investigation Period._** To facilitate a credit bid by Imperium in connection with the Sale (as defined below), the time to investigate and challenge findings of fact, representations, covenants and waivers that bind the Estate and other parties in interest with respect to the validity, perfection, extent or amount of Imperium's claims has been limited to the earlier of sixty (60) calendar days from the date of entry of the Interim Order or the deadline to object to the Sale Motion. See Interim Order, ¶ 4.1.

(j) **_Events of Default._** Events of Default under the DIP Facility Agreement are identified in Sections 11.1 and 14.5 of the DIP Facility Agreement and Paragraphs 3.1 and 3.2 of the DIP Order.

(k) **_Post-Petition Liens and DIP Facility Superpriority Administrative Expense._**

(i) _Post-Petition Lien Granting._ To secure the prompt payment and performance of any and all Post-Petition Obligations of the Debtor to the Collateral Agent and Imperium, the Collateral Agent, for the benefit of itself and Imperium, shall have, effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtor's Estate may have (but subject to certain claims entitled to priority, including the Permitted Liens and Claims[4], as and to the extent expressly provided in Section 2.1.2 of the Interim Order), in and upon all of the Pre-Petition Collateral and the Post-Petition Collateral (as defined in the DIP Facility Agreement). The Collateral shall not include avoidance actions under Chapter 5 of the Bankruptcy Code. In accordance with Section 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of Obligations secured by such Collateral after satisfaction of the Post-Petition Obligations of Debtor to the Collateral Agent and Imperium shall constitute additional security for the repayment of the Pre-Petition Obligations and adequate protection for the use by Debtor, and the diminution in the value, of the Pre-Petition Collateral. See Interim Order, ¶ 2.1.1.

---

[4] "Permitted Liens and Claims" means (a) liens or security interests in the Collateral that are permitted under the Security Agreement or other Financing Agreements and that are perfected, valid, enforceable, and unavoidable as of the Petition Date; (b) the Carve Out Expenses solely to the extent provided for in Sections 2.3, 2.4 and 2.5 of this Interim Order; and (c) to the extent that the retainer held by counsel to the Debtor as of the Petition Date is less than the total fees of Debtor's counsel provided for in the Budget, the difference in such amounts, which difference shall be reserved to assured payment of the amounts as set forth in the Budget

US_ACTIVE-106798815.7

(ii)    Superpriority Administrative Expense.  For all Post-Petition Obligations now existing or hereafter arising pursuant to the Interim Order, the Financing Agreements or otherwise, Imperium shall have an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, whether now in existence or hereafter incurred by the Debtor, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia* Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, the Superpriority Claim shall be subject only to the Permitted Liens and Claims as and to the extent expressly set forth in the Interim Order.  See Interim Order, ¶ 2.2.

(l)    ***Adequate Protection for Use of Cash Collateral.***

(i)    Replacement Liens.  As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtor's use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, the Collateral Agent, for the benefit of itself and Imperium, shall have pursuant to Sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "Adequate Protection Replacement Lien").    The Adequate Protection Replacement Lien shall be junior and subordinate only to the Permitted Liens and Claims and the liens and security interests granted to the Collateral Agent and Imperium in the Collateral securing the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.  See Interim Order, ¶ 2.6.2.

(ii)    Section 507(b) Priority Claim.  As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtor's use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out-Expenses, Imperium shall have granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Case and any Successor Case (the "Adequate Protection Superpriority Claim").  The Adequate Protection Superpriority Claim shall be junior only to the Permitted Liens and Claims and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtor and its Estate now existing or hereafter arising, of any kind or nature whatsoever.  See Interim Order, ¶ 2.6.3.

(m)    ***506(c) Waiver.***  Subject to entry of the Final Order, the Debtor is seeking a waiver of section 506(c) of the Bankruptcy Code.  See Interim Order, ¶ 4.3.

- 5 -

(n)   ***Carve Out Expenses.*** Upon the declaration by Imperium or Collateral Agent of the occurrence of an Event of Default, Collateral Agent's and Imperium's liens, claims and security interests in the Collateral and the Superpriority Claim shall be subject only to the right of payment of the following expenses (the "Carve Out Expenses"): (a) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the Clerk of this Court; and (c) subject to the terms and conditions of this Interim Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtor and any Committee(s) under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals"), less the amount of any retainers, if any, then held by such Professionals, in a cumulative, aggregate sum not to exceed $25,000 (the "Professional Fee Carve Out"). See Interim Order, ¶ 2.3.1.

## III.   FACTUAL BACKGROUND

4.     On July 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in an effort to preserve and maximize the value of its estate, thereby commencing the above-captioned bankruptcy case (the "Case").

### A.   Overview Of The Debtor's Business.

5.     Entelos is a privately-held Delaware corporation.

6.     Entelos is a cutting edge software and services company that provides customized solutions to complex problems in healthcare by the creation and use of innovative tools and products. Generally, Entelos consults for and collaborates with pharmaceutical and consumer product companies, as well as governmental and research organizations, worldwide. Entelos is a leader in the development and application of mechanistic disease models and biosimulation methodologies designed to optimize clinical trial design, identify biomarker patterns, characterize sub-populations, and improve efficiency in patient management and healthcare systems. Entelos' mechanistic disease models allow for a deeper exploration of novel target biology and hypotheses testing in the absence of supporting human clinical data.

- 6 -

7.     Combining biology, engineering, and informatics,[5] Entelos is a cutting-edge software and services company that simulates experiments in large-scale computer models (*in silico*),[6] rapidly testing what would otherwise take months or years to do in the laboratory or clinic. As the leader in *in silico* biosimulation modeling, Entelos is a life sciences company applying next-generation predictive technologies across multiple markets in research and development of healthcare and consumer products to dramatically lower the risk, time, and cost of product development. Entelos' customers save both time and money by optimizing clinical programs and research and development through virtual population simulations, focusing on the best inclusion criteria, dosing, timing, and markers to obtain meaningful trial outcomes. Through this process, Entelos provides advanced knowledge of a compound's likely safety profile and effectiveness, creating an opportunity to shift termination or advancement decisions to occur earlier in the drug and product development process, and thereby improve overall drug and product development efficiency.

8.     Seeking to build the most accurate models of human disease possible, Entelos currently provides customized products, technology and research services. Entelos has expertise in the following areas: Toxicity and Safety, Respiratory, Immunology/Inflammation, Metabolism, Cardiovascular, Epidermis and Erythropoiesis.[7]

9.     Entelos' *in silico* disease technology, known as PhysioLab®, is used to select and develop compounds, assess safety, optimize clinical trials and combination therapies, and

---

[5] "Informatics" is the application of information science and statistical techniques to the management of information.

[6] "*In silico*" means performed on computer or via computer simulation, as opposed to "*in vivo*," meaning performed on living organisms.

[7] "Erythropoiesis" is the formation or production of red blood cells.

US_ACTIVE-106798815.7

reprofile drugs. The PhysioLab® platforms, "virtual human" technology, and toxicology reference systems are highly predictive and assist clients to develop safer and more effective drugs and personal care products. PhysioLab® research teams work closely with a broad network of experts to build, refine, and validate each disease- and therapeutic area-specific PhysioLab® platform. PhysioLab® platforms are large scale, computer-based mathematical models of physiology. With PhysioLab® virtual patients and virtual populations, Entelos is able to simulate the *in vivo* effects of drugs and optimize the effects and protocols before running time-consuming and expensive clinical studies.

10.     Entelos' PhysioLab® platforms simulate complex biological systems *in silico*, enabling a novel way to perform biology-based research and development. The success of PhysioLab® platforms as a systems biology framework lies in Entelos' cutting-edge proprietary modeling software that allows researchers to translate biology into mathematics; scalable, hypothesis-driven approaches to modeling biology and pathophysiology;[8] virtual patients and populations to explore the range of human physiology; and model-based research and development techniques.

11.     PhysioLab® technology is protected by patents (issued and pending) related to its underlying software, specific disease models, and the scientific methodologies developed for its application.

### B.     Pre-Petition Capital Structure

12.     Entelos was incorporated in the State of California on July 31, 1996.

13.     On April 4, 2006, Entelos reincorporated from the State of California into the State of Delaware.

---

[8] "Pathophysiology" is the scientific study of changes associated with or resulting from disease or injury.

US_ACTIVE-106798815.7

14.     From April 2006 until June 2009, Entelos' common stock was traded on the
Alternative Investment Market of the London Stock Exchange (the "AIM Exchange"). Entelos,
with the support of its stockholders, delisted its common stock from the AIM Exchange effective
as of July 1, 2009.[9]

15.     Entelos' capital stock is held by venture firms, other life sciences companies, and
individual investors. Imperium Master Fund, Ltd. ("Imperium") holds 3,990,537 shares of the
Class A Common Stock in Entelos, which is approximately 6.07% percent of the shares of Class
A Common Stock. Imperium also holds all of the 300,459,823 shares of Series A Preferred
Stock.

16.     As of the Petition Date, the Debtor owed first priority, secured debt to Imperium
in the approximate amount of $8,442,000, inclusive of interest accrued though July 22, 2011,
plus interest thereafter and all costs, fees, expenses (including reasonable attorneys' fees and
legal expenses) and other charges, which consists of the following notes: (1) Senior Term Note
dated April 15, 2010, in the original principal amount of $6,000,000,[10] (2) Supplemental Term
Note, dated June 2, 2011, in the original principal amount of $500,000, (3) Second Supplemental
Term Note, dated June 24, 2011, in the original principal amount of $850,000, and (4) Secured
Term Promissory Note, dated July 22, 2011, in the original principal amount of $300,000.

---

[9] Entelos is the parent company of the Guarantors: Entelos UK, Eratosthenes, and Digitalself. The Guarantors do not have any current business operations. The Guarantors have little or no assets.

[10] Imperium and Entelos are parties to that certain Securities Purchase and Loan Agreement, dated as of December 21, 2007, pursuant to which Imperium purchased from Entelos a senior secured note with a purchase price of $1,500,000.00 and a stated principal amount at maturity of $1,698,758.28 (the "Prior Note"), and two original issue secured convertible debentures with a purchase price of $3,000,000.00 and $2,000,000.00, respectively, and a stated principal amount at maturity of $3,314,139.00 and $2,209,426.00, respectively (the "Convertible Debentures"). Entelos defaulted in the payment under the Prior Note. Thereafter, Imperium and Entelos entered into an Exchange Agreement dated as of March 25, 2010, to restructure the Prior Note and the Convertible Debentures by converting the outstanding principal balances on the Prior Note and Convertible Debentures, and all accrued and unpaid interest and any applicable redemption premium and/or penalties thereon, into the Senior Term Note and shares of Series A Preferred Stock.

US_ACTIVE-106798815.7

17.     Pursuant to a Security Agreement dated as of December 21, 2007, as amended on January 1, 2008, and the Amended and Restated Security Agreement dated as of April 15, 2010, the Existing Financing Agreements are secured by substantially all of Entelos' assets.

18.     As of the Petition Date, the Debtor also owed unpaid pre-petition unsecured claims in excess of $10 million.

### C.     Events Leading to the Debtor's Bankruptcy Filing

19.     In 2008,[11] Entelos had revenue of $18.12 million and operating costs of $30.64 million, resulting in a loss from operations of $12.52 million.

20.     As of December 31, 2008, Entelos had approximately $2 million in cash.

21.     As of December 31, 2008, Entelos had total assets with a book value of $8.3 million and total liabilities of $13.2 million.

22.     As of December 31, 2008, Entelos had accumulated a shareholders' deficit of $87.15 million.

23.     Based on its financial performance through 2008, Entelos' auditors stated that "[g]iven the Company's recurring net losses, negative cash flows from operations, stockholders' deficit, negative working capital, and the uncertainty related to its debt covenants, there is substantial doubt about the ability of the Company to continue as a going concern."

24.     Market conditions in the pharmaceutical industry have deteriorated in recent years. For example, it has been reported that overall research and development ("R&D") investment by the top 10 pharmaceutical companies fell $421 million from 2008 to 2009 (from $57.54 billion to $57.12 billion). See http://www.pharmaceutical-market-research.com/publications/pharmaceutical_companies/pharmaceutical_companies_performance_

---

[11] Calendar year 2008 is the last year for which the Debtor has audited financial statements.

US_ACTIVE-106798815.7

tables.html. Reuters noted that pharmaceutical R&D spending decreased by $2.0 billion dollars from 2009 to 2010. See http://www.reuters.com/article/2011/06/26/pharmaceuticals-rd-idUSL6E7HO1BL20110626 (June 26, 2011).

25. Entelos continued to operate with limited liquidity in a difficult pharmaceutical industry.

26. For the first six months of 2011, the Debtor received, on a cash basis, $2.6 million in revenue (based on the Debtor's unaudited financial statements for such period) and $5.7 million in operating expenses.

27. The Debtor also believes that its prior executive officers made strategic mistakes and mismanaged the Debtor and its resources, thereby thrusting the Debtor into a severe liquidity crisis, which has not lessened.

28. With little revenue in a stingy capital market, the Debtor has been unable to generate adequate liquidity from revenue or financing to pay its prepetition obligations.

29. On or about June 17, 2011, the landlord of the Debtor's headquarters property located at 110 Marsh Drive, First Floor, Foster City, California (the "Premises") instituted an unlawful detainer and eviction action against the Debtor in the Superior Court of California, San Mateo County (the "Superior Court"), which case was assigned Case No. Civ 204137 (the "Landlord Action"). On July 21, 2011, the parties to the Landlord Action attended mediation relative to the Landlord Action but were unable to resolve their disputes. An unlawful detainer hearing in the Landlord Action is scheduled for hearing before the Superior Court on July 25, 2011 at 9:00 a.m. (Pacific).

30. On July 22, 2011, the Debtors also received a default notice from Imperium (the "Default Notice"). Imperium advised the Debtor that various Events of Default have occurred

- 11 -

US_ACTIVE-106798815.7

and are continuing to occur under the Promissory Notes, including, without limitation, a material adverse change to (a) the financial condition or results of Entelos' operations or (b) Entelos' cash balances or cash flows (collectively, the "Specified Defaults").  As a result of the occurrence of the Specified Defaults, Imperium declared that it was (i) exercising its right pursuant to Section 3(a) of the Promissory Notes to cause the Promissory Notes to be redeemed at the redemption price set forth in such Section 3(a) and (ii) notifying the Debtor that all Promissory Notes shall accrue certain default interest.

### D.     Prior Efforts to Raise Capital or Sell the Business.

31.     In 2009, Entelos engaged Seven Hills Partners, LLC ("Seven Hills"), a boutique investment bank focused on financings and mergers & acquisitions for growth companies, to raise capital (debt or equity) for, or find an acquirer for, Entelos.  Seven Hills' efforts did not result in any transaction.

### E.     The Stalking Horse Agreement and Proposed Sale

32.     On July 25, 2011, the Debtor and Imperium (together with its designee or assignee, also referred to as the "Purchaser") entered into that certain Bill of Sale (the "Stalking Horse Agreement") whereby the Purchaser agreed to purchase substantially all of the Debtor's assets (the "Sale").  Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtor's assets shall include (i) a credit bid consisting of amounts outstanding under the DIP Facility, and (ii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction.  The Stalking Horse Agreement provides the Debtor with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtor with a floor against which other bidders can submit competing bids.  The Debtor will be filing a motion with the Court on the

US_ACTIVE-106798815.7

Petition Date seeking approval of certain bidding procedures in connection with an approximately forty-five (45) day sale process followed by approval of a sale of the Debtor's assets to the highest and best bidder as determined at an auction (the "Sale Motion").

### F.    The DIP Facility

33.    In connection with the Chapter 11 Cases, the Borrower, the Guarantors and the Lender have entered into the DIP Facility Agreement, pursuant to which the Lender has agreed to provide post-petition financing to the Debtor up to the aggregate principal amount of $1.7 million.  The DIP Facility will be used to, among other things, cover anticipated administrative obligations of the Chapter 11 Case.  As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

## IV.    RELIEF REQUESTED

34.    By this Motion, the Debtor requests entry of the DIP Orders[12] authorizing the Debtor to (i) obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $1.7 million pursuant to the terms of this Motion, the DIP Facility Agreement, and the DIP Orders, (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant liens and a superpriority claim to the Collateral Agent, on behalf of the Lender, as security for the repayment of the DIP Facility; and (iv) grant adequate protection liens and a superpriority claim to the Collateral Agent, on behalf of the Lender, to the extent that there is any diminution in the value of the Lender's interests in the Pre-Petition Collateral during the pendency of the Chapter 11 case.

---

[12] A copy of the Debtor's proposed Interim Order is attached hereto as Exhibit B.

US_ACTIVE-106798815.7

## V.   BASIS FOR RELIEF REQUESTED

### A.   Negotiations and Need for Post-Petition Financing

35.   As demonstrated by the 8-week budget attached hereto as <u>Exhibit C</u> (the "<u>Budget</u>"),[13] the Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course without the financing requested under this Motion.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the assets of the Estate (as defined below) for the benefit of all creditors of the Debtor.  The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the Collateral Agent and Imperium is vital to the preservation and maintenance of the going concern value of the Debtor.  Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of its business operations, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate (as defined under Section 541 of the Bankruptcy Code, the "<u>Estate</u>") in order to maximize the recovery to all creditors of the Estate.

36.   The Debtor is unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens

---

[13] The Debtor and the Lender have agreed upon the Budget, and believe that it is achievable and will allow the Debtor to operate and pay its post-petition obligations as they mature.

US_ACTIVE-106798815.7

on assets. The Debtor has been unable to procure the necessary financing on terms more favorable than the financing offered by the Collateral Agent and Imperium pursuant to the Financing Agreements.

37.     The Debtor has prepared and delivered to Imperium the Budget. Such Budget has been reviewed by the Debtor and its management and sets forth, among other things, projected weekly cash disbursement of the Debtor for the periods covered thereby. The Debtor believes that the Budget is achievable and will allow the Debtor to operate at all times during the Chapter 11 Case without the accrual of unpaid administrative expenses. The Collateral Agent and Imperium are relying upon the Debtor's compliance with the Budget in accordance with the DIP Facility Agreement and the DIP Orders in determining to enter into the post-petition financing arrangements described herein.

38.     The terms of the DIP Facility Agreement are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Facility Agreement have been negotiated in good faith and at arms' length by and among the Debtor, on one hand, and the Collateral Agent and Imperium, on the other hand, with all parties being represented by counsel.

39.     The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its Estate, as the implementation of such relief will, among other things, provide the Debtor with the necessary liquidity to (a) minimize disruption to the business and on-going operations, (b) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors, and

US_ACTIVE-106798815.7

(c) avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees, and its assets.

**B.**    **Use of Cash Collateral and Proposed Adequate Protection**

40.    Under the terms of the DIP Facility Agreement, the Cash Collateral (other than proceeds of the DIP Facility) and other proceeds from any Pre-Petition Collateral will be used to reduce the Pre-Petition Obligations, and the Debtor shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. After the payment of the Pre-Petition Obligations in full, or after an Event of Default, all Cash Collateral shall be applied to the DIP Facility pursuant to the terms of the DIP Facility Agreement. The Collateral Agent, for itself and for the Lender, has consented to the Debtor's use of cash collateral on the terms described in the DIP Facility Agreement, subject to the adequate protection liens, superpriority claims and payments discussed below and the other terms and conditions set forth in the Interim Order.

41.    The Collateral Agent, on behalf of the Lender, has consented to adequate protection of their interests in collateral under the Existing Financing Agreements to the extent that there is a diminution in the value of such collateral arising from the Debtor's use thereof from and after the Petition Date. As adequate protection for any such diminution in value, the imposition of the automatic stay and the subordination to the Carve-Out Expenses, the Collateral Agent, on behalf of the Lender, shall be granted the following:

(i) pursuant to Sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral. This replacement lien which shall be junior and subordinate only to the Carve-Out Expenses and the liens and security interests that serve the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against, any of the Collateral;

(ii) to the extent provided by Section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim having priority in right of payment over any and all other obligations, liabilities or indebtedness of the Debtor;

- 16 -

(iii) any amounts or payments received by Collateral Agent or Imperium in respect of the Obligations shall be applied first to the Pre-Petition Obligations, until such Pre-Petition Obligations are indefeasibly paid in full and completely satisfied, and then to the Post-Petition Obligations;

(iv) the Debtor shall be obligated, without further order of the Court, to pay, the fees and expenses of legal counsel and other professionals retained by the Collateral Agent and Imperium; and

(v) except for the liens and superpriority claims and liens contemplated by this Motion, the Debtor shall be prohibited from seeking additional indebtedness with lien status or priority over the Pre-Petition Obligations or liens equal to or senior in priority to the liens provided under the DIP Orders with respect to the Pre-Petition Obligations.

## C.    **The DIP Facility Should Be Authorized**

42.    Approval of the DIP Facility will provide the Debtor with immediate and ongoing access to funds to pay its current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtor will be forced to cease operations, which would likely (i) result in irreparable harm to its business, (ii) deplete going concern value, and (iii) jeopardize the Debtor's ability to maximize value. The credit provided under the DIP Facility Agreement will enable the Debtor to continue to satisfy its vendors, service its customers, pay its employees, and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all stakeholders. The availability of credit under the DIP Facility Agreement will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtor's vendors, employees, and customers, thereby promoting a successful resolution of this Chapter 11 Case.  Accordingly, the timely approval of the relief requested herein is imperative.

US_ACTIVE-106798815.7

43.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtors to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  See 11 U.S.C. § 364.  The Debtor proposes to obtain the financing set forth in the DIP Facility Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

44.     The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to borrow under the DIP Facility Agreement and to use such proceeds to fund its operations.  As discussed above, the Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtor has not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

45.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and

- 18 -

US_ACTIVE-106798815.7

powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest");
see also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87 (Bankr. W.D. Pa. 1987); In re Curlew
Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R.
444, 449 (D. Colo. 1985).

46.     Furthermore, section 364(d) does not require that a debtor seek alternative
financing from every possible lender; rather, the debtor simply must demonstrate sufficient
efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d
at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of
unsuccessful contact with other financial institutions in the geographic area); In re 495 Central
Park Ave Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed
attempts to procure financing from various sources, explaining that "most lend money only in
return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa.
1991) (debtor adequately established that some degree of priming of loan was necessary if debtor
were to obtain funding).

47.     Substantially all of the Debtor's assets are encumbered and the Debtor has been
unable to procure the required funding absent granting the proposed superpriority claims and
liens.[14] The Debtor submits that the circumstances of this case require the Debtor to obtain
financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and,
accordingly, the DIP Facility Agreement reflects the exercise of its sound business judgment.

48.     The terms and conditions of the DIP Facility Agreement are fair and reasonable,
and were negotiated extensively by well-represented, independent parties in good faith and at

---

[14] The Debtor is seeking to prime only the liens of the Lender, and not any third party liens.

US_ACTIVE-106798815.7

arm's-length. Accordingly, the Lender and all obligations incurred under the DIP Facility Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**D.     The Use of Cash Collateral Should Be Approved**

49.     Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U S.C. § 363(c)(2). The Debtor requires the use of Cash Collateral to fund its day-to-day operations. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors. The interests of the Lender in the cash collateral will be protected by the adequate protection set forth above. Moreover, the Prepetition Lender has consented to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtor's request to use Cash Collateral should be approved.

**E.     The Proposed Adequate Protection Should Be Authorized**

50.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to

US_ACTIVE-106798815.7

protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

51.     The Lender has agreed to the Debtor's use of Cash Collateral and the Debtor's entry into the DIP Facility Agreement in consideration for the adequate protection provided under the DIP Facility Agreement.  Accordingly, the adequate protection proposed herein to protect the Lender's interest in the Pre-petition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

**F.      The Automatic Stay Should Be Modified on a Limited Basis**

52.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the security interests, liens, and superpriority claims described above with respect to the Lender, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Lender to exercise, upon the occurrence of and during the continuance of an event of default and after five (5) business days notice of, all rights and remedies under the DIP Facility Agreement; and (iii) implement the terms of the DIP Orders.

53.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**G.      Interim Approval Should Be Granted**

54.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14)

US_ACTIVE-106798815.7

days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

55.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtor to borrow under the DIP Facility on an interim basis, pending entry of a final order in the amount necessary under the Budget to fund the Debtor's business up to the date scheduled for the final hearing on the Motion, in order to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (b) schedule a hearing to consider entry of the Final Order.

56.     The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Debtor will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility Agreement will provide necessary assurance to the Debtor's vendors, employees, and customers of its ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtor. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor.

US_ACTIVE-106798815.7

57.     The Debtor further submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

58.     To successfully implement the foregoing, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## H.     A Final Hearing Should Be Scheduled

59.     Pursuant to the Bankruptcy Rule 4001(c)(2), the Debtor requests that a final hearing on this Motion be scheduled at least fourteen (14) days after service of this Motion.

## Notice

60.     Pursuant to Fed.R.Bankr.P. 2002 and Del.Bankr.LR. 2002-1(b), notice of this Motion has been given to (a) the U.S. Trustee; (b) the Debtor's creditors holding the twenty (20) largest unsecured claims; (c) the Lender and the Collateral Agent; (d) all parties asserting a lien against the Collateral; (e) the Internal Revenue Service; and (f) the Office of the United States Trustee.  In light of the nature of the relief requested in this Motion, the Debtor submits that no other or further notice is required.

## No Prior Request

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

US_ACTIVE-106798815.7

WHEREFORE the Debtor respectfully requests entry of the DIP Orders granting the relief requested herein and such other and further relief as is just.

Wilmington, Delaware
Dated:  July 25, 2011

Respectfully submitted,

REED SMITH LLP

By:  /s/ Richard A. Robinson
Kurt F. Gwynne (No. 3951)
Richard A. Robinson (No. 5059)
Timothy P. Reiley (No. 5435)
1201 Market Street; Suite 1500
Wilmington, DE 19801
Phone:  (302) 778-7500
Fax:  (302) 778-7575
Email: kgwynne@reedsmith.com
        rrobinson@reedsmith.com
        treiley@reedsmith.com

Proposed Counsel for the Debtor in Possession

US_ACTIVE-106798815.7